[Cite as *State v. Inkton*, 2016-Ohio-693.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 102706

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## RONALD INKTON

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-587822-A

**BEFORE:** Celebrezze, J., E.T. Gallagher, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** February 25, 2016

**ATTORNEY FOR APPELLANT**

Erin R. Flanagan
Erin R. Flanagan, Esq. Ltd.
75 Public Square
Suite 1325
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    Brian D. Kraft
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

FRANK D. CELEBREZZE, JR., J.:

{¶1} Defendant-appellant Ronald Inkton ("appellant") brings this appeal challenging his convictions for rape, aggravated robbery, kidnapping, and having weapons while under disability. Specifically, appellant argues that: (1) the evidence was insufficient to support his convictions, (2) his convictions are against the manifest weight of the evidence, and (3) the trial court improperly admitted unauthenticated hearsay evidence. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶2} On June 30, 2014, the female victim and her brother-in-law were walking to a gas station to purchase cigarettes when they stopped in a K-Mart parking lot near the intersection of Lorain Avenue and West 150th Street in Cleveland, Ohio. A group of three males brandishing guns approached the female victim and her brother-in-law in the parking lot. The males robbed the female victim and her brother-in-law at gun point, and proceeded to rape the female victim, both orally and vaginally. During this encounter, the female victim's brother-in-law fled from the parking lot and flagged down Officer Brian Kluth who was driving in his police cruiser nearby. The brother-in-law informed Officer Kluth that he had just been robbed by three males. Officer Kluth broadcasted the information over the radio.

{¶3} Officer Brian Davis responded to the radio call and observed a male coming out of the Veterans of Foreign Wars ("VFW") parking lot. The VFW parking lot is

adjacent to the K-Mart parking lot on the south side. Officer Davis exited his vehicle and approached the individual, seeking to question him. However, as Officer Davis approached the individual, the male took off running and evaded the officers that pursued him. Officers never found this individual.

{¶4} Officer Robert Cruz also responded to the radio call and observed two males and a female near some bushes behind K-Mart. Officer Cruz testified that the individuals appeared to be engaging in sexual activity. Officers were able to detain the two males — codefendants Dante Martin and Jonathan Hooks. The female victim told the officers that a third male fled the scene.

{¶5} Codefendant Hooks initially did not reveal the identity of the third male who ran away to the investigating officers. However, in July 2014, Hooks informed officers that appellant was the male who ran away and evaded the police on the morning of June 30, 2014.

{¶6} The Cuyahoga County Grand Jury returned a ten-count indictment charging appellant with: (1)-(4) rape, R.C. 2907.02(A)(2), (5)-(6) aggravated robbery, R.C. 2911.01(A)(1), (7) kidnapping, R.C. 2905.01(A)(4), (8)-(9) kidnapping, R.C. 2905.01(A)(2), and (10) having weapons while under disability, R.C. 2923.13(A)(2). Counts 1 through 9 included both one- and three-year firearm specifications and forfeiture of a weapon. Count seven included a sexual motivation specification. Count ten included a forfeiture of a weapon while under disability.

{¶7} The grand jury also charged appellant's codefendants, Martin and Hooks, with Counts 1 through 9. Codefendants Martin and Hooks pled guilty to Counts 1, 5, and 7 in exchange for their testimony against appellant. Appellant pled not guilty and the matter proceeded to trial.

{¶8} The state called the following witnesses at trial: (1) the female victim, (2) codefendant Martin, (3) codefendant Hooks, (4) Cleveland Police Officer Kluth, (5) Cleveland Police Officer Davis, (6) Cleveland Police Officer Cruz, (7) sexual assault nurse examiner ("SANE") Lisa Clark, (8) Jeffrey Oblock, a forensic scientist in the Cuyahoga County Regional Forensic Science Laboratory's DNA department, (9) Detective Todd Marazzi of the city of Cleveland's firearms forensic lab, (10) Detective Morris Vowell of the Cleveland Police Department's sex crimes unit, and (11) Barbara Sylvester of Madison, Wisconsin's state crime laboratory DNA databank unit.

{¶9} The jury found appellant guilty of Counts 1 through 9, and the trial court found appellant guilty of Count 10. The trial court found that Counts 7, 8, and 9 merged with Counts 2, 5, and 6. Accordingly, the trial court proceeded to sentence appellant on Counts 1 through 6 and Count 10.

{¶10} The trial court sentenced appellant to a total of 18 years of imprisonment at the Lorain Correctional Institution: 9 years on Count 1, 11 years on Count 2, 9 years on Count 3, 11 years on Count 4, 4 years on Count 5, 3 years on Count 6, and 24 months on Count 10. The trial court ordered the sentences on Counts 1 through 4 to be served

concurrently with one another. The trial court ordered the sentences on Counts 5, 6, and 10 to be served concurrent to each other and consecutive to Counts 1 through 4. Furthermore, the trial court merged the three-year firearm specifications attached to counts 1 through 6, and ordered appellant to serve 3 years of imprisonment on the firearm specifications prior and consecutive to the 15 years on the underlying felonies. The trial court ordered five years of postrelease control on Counts 1 through 6 and three years of postrelease control on Count 10. The trial court designated appellant a Tier III sex offender.

{¶11} Appellant filed the instant appeal assigning three errors for review:

I. The trial court erred to appellant's prejudice by entering a verdict of guilty, which sufficient evidence did not support, in derogation of appellant's right to due process of law under the Fourteenth Amendment of the United States Constitution.

II. The trial court erred to appellant's prejudice by entering a verdict against the manifest weight of the evidence, in derogation of appellant's rights to due process of law under the Fourteenth Amendment to the United States Constitution.

III. The trial court erred to appellant's prejudice by entering a verdict of guilty by allowing the jury to hear and consider unsubstantiated hearsay evidence in derogation of the Ohio Rules of Evidence.

## II. Law and Analysis

### A. Sufficiency

**{¶12}** In his first assignment of error, appellant argues that there was no physical or circumstantial evidence linking him to the crimes, and thus his convictions were not supported by sufficient evidence. We disagree.

**{¶13}** When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. This court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

**{¶14}** Appellant was convicted of rape, aggravated robbery, kidnapping, and having weapons while under disability.

**{¶15}** R.C. 2907.02(A)(2), rape, provides "no person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

**{¶16}** R.C. 2911.01, aggravated robbery, provides, in relevant part:

(A)   No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1)   Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.

{¶17} R.C. 2905.01, kidnapping, provides, in relevant part:

(A)   No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2)   To facilitate the commission of any felony or flight thereafter;

* * *

(4)   To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.

{¶18} R.C. 2923.13, having weapons while under disability, provides, in relevant part:

(A)   Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

(2)   The person is under indictment for or has been convicted of any felony offense of violence * * *.

{¶19} In the instant matter, there was a lack of physical evidence tying appellant to the crime.   Forensic DNA analyst Jeffrey Oblock testified that he tested the DNA samples collected from the female victim.   Oblock testified that Hooks was a contributor

to the DNA profile from semen on the victim's chest and clothing. Both Hooks and Martin were contributors to the DNA profiles from: (1) semen found inside the victim's tank top, and (2) an oral swab taken from the victim's mouth. Appellant was excluded as a contributor to the DNA samples taken from the female victim. Barbara Sylvester of the Madison, Wisconsin state crime laboratory testified that a DNA profile in the Madison, Wisconsin databank, belonging to an individual who was not involved in the instant matter, matched the DNA collected from the female victim.

{¶20} The state's case rested on: (1) eyewitness testimony, and (2) circumstantial evidence.

### 1. Eyewitness Testimony

{¶21} The state presented the testimony of three eyewitnesses: (1) the female victim, (2) codefendant Dante Martin, and (3) codefendant Jonathan Hooks.

{¶22} First, the female victim testified that in the early morning hours of June 30, 2014, she was walking with her brother-in-law to the Sunoco gas station at West 136th Street and Lorain Avenue to purchase cigarettes. The female victim testified that she was walking ahead of her brother-in-law and that she "heard some people running." The victim testified that she turned around and saw "somebody with a gun to me and then there was people with guns on [the brother-in-law]." The victim testified that one of the males ("male 1") ordered her to follow him to the side of the building at gunpoint. She testified that male 1, still holding a gun to her, said "we're going to run a trailer in the

ditch," which led her to believe that the individuals were going to rape her. She testified that male 1 took her into the woods behind K-Mart, still holding the weapon, and ordered her to "get down on [her] knees and suck his dick." She testified that she complied with the male 1's demands because he had a gun.

{¶23} The female victim testified that as she was performing oral sex on male 1, the two other attackers ("males 2 and 3") came into the woods behind K-Mart. She testified that males 2 and 3 informed male 1 that her brother-in-law took off running and got away. She testified that male 1 asked males 2 and 3 "you guys going to join in on this?" She testified that she gave oral sex to males 2 and 3, going back and forth between the two. She testified that male 1 took out a plastic zip-loc baggie, placed it around his penis, and started having vaginal sex with her. She testified that she observed two revolvers during the attack — male 1 had his own revolver and males 2 and 3 passed another revolver back and forth. She testified that a weapon was drawn at all times during the oral and vaginal sex. She testified that male 1 did not ejaculate in her mouth, and that males 2 and 3 did ejaculate in her mouth. She testified that she believed male 1 ejaculated in the zip-loc bag because "he said he was done." She testified that male 1 tossed the zip-loc bag to the side.

{¶24} The female victim testified that males 1, 2, and 3 were all present when she first saw police officers approaching the woods behind K-Mart. However, she testified that male 1 got away, running west out of the woods towards West 150th Street. She

testified that males 2 and 3 remained in the woods and attempted to hide the gun. She testified that she was present when officers located the gun that the males 2 and 3 attempted to hide. She testified that she did not know what happened to the second gun used during the attack, but guessed that male 1 had it with him when he ran away from the police. She testified that the males took her phone and her brother-in-law's phone out of her purse. She testified that she later learned that 30 dollars and her ID were missing from her purse, and that officers did not recover those items. She testified that male 1 took a pill bottle from her purse.

{¶25} She testified that she described male 1 to the police as a tall, slim African American male, around 19 or 20 years old. She testified that she was unable to identify male 1 from photo arrays. She testified that she was able to see male 1's face briefly when he first approached her with a gun, but that she did not have any further opportunities to see his face because it was too dark in the woods. Furthermore, she testified that she was more focused on the gun male 1 was holding than male 1's face.

{¶26} She testified that she was transported to Fairview Hospital where a rape kit was performed on her. She read the following summary of her statements to the SANE from her medical records:

> Between 2 and 3 a.m. me and my brother-in-law were walking by K-Mart to get some cigarettes in the parking lot of K-Mart. Three black guys came up to us, put a gun to us, grabbed my purse, dragged me to the side of K-Mart, then dragged me into the woods.
> They robbed my brother-in-law and they let him go. One guy took me to the side of the building. Then the other two followed. All three guys

made me do oral sex. They were pulling my hair, forcing me. Pulling my hair and forcing me.

I have a headache now. Then the tall guy used a sandwich bag over his penis and put it in my vagina. Two of the guys ejaculated in my mouth and the other guy must have busted into the sandwich bag.

{¶27} She read the following history paragraph from a note in her medical records, authored by Nurse Christine Davis:

39 year old female states that she and her brother was walking. Three men robbed them at gunpoint. Patient states that they let her brother go but took her into the woods and made her perform oral sex on them. There was no vaginal or rectal penetration. She does not want to see any physician.

{¶28} Finally, she testified that she knew the male who Sylvester identified from the Madison, Wisconsin DNA databank, and that she had sex with him around the time of the June 30, 2014 attack.

{¶29} Second, codefendant Dante Martin testified that he was with appellant and codefendant Hooks on the night of June 29 and the early morning of June 30, 2014. Martin testified that the males were robbing people to try and come up with some money. Martin testified that the males stopped at the house of codefendant Hooks' brother Darius Robinson, who lives on the west side, on the night of the incident. Martin testified that Darius was not with the males when they robbed the victims.

{¶30} Martin testified that on the night of the incident, he had a .22 revolver and appellant had a .38 revolver. Martin testified that he and Hooks attempted to rob the male while appellant robbed the female. Martin testified that he held a gun on the male

victim while Hooks went through his backpack. Martin testified that after he robbed the male victim, he told him he could go, and that the male victim "ran down the main street."

{¶31} Martin testified that the female victim told the males that she was a prostitute and offered to give the males oral sex. Furthermore, Martin testified that the female victim told the males about a local drug dealer that they could rob. Martin testified that he and appellant still had guns in their possession when the female performed oral sex on them. Martin testified that he and Hooks ejaculated, and that appellant ejaculated in the grass. Martin testified that the female victim voluntarily went into the woods with the males. Martin testified that he never committed a rape, and that he lied to the judge when he pled guilty to rape on an earlier date.

{¶32} Martin testified that police approached the males and the female in the woods, and that appellant took off running while he and Hooks remained at the scene. Martin testified that appellant had a weapon with him when he took off running. Martin testified that he tossed the weapon he was holding in the bushes.

{¶33} Martin testified that he did not give appellant's name to law enforcement until December 29, 2014 — six months after the date of his arrest. Martin testified that no one else was with him, appellant, and Hooks when they committed the crimes.

{¶34} Third, codefendant Jonathan Hooks testified that he was with Dante Martin and appellant during the evening of June 29, 2014. Hooks testified that the males

wanted money and were looking for somebody to rob on the west side. Hooks testified that Martin and appellant had weapons when they were walking around on Lorain Avenue. Hooks testified that Martin's weapon was a .22 and appellant's weapon was a .38. Hooks testified that no one else was with him, appellant, and Martin when they were looking for people to rob. Hooks testified that they neither saw nor went to the house of Darius Robinson on the night of the incident. Hooks testified that the males observed a Caucasian female and male in front of K-Mart and decided to rob them. Hooks testified that appellant approached the female with a gun in his hand and Martin approached the male holding a gun. Hooks testified that he walked over to Martin and the male he was robbing, but that he neither participated in the robbery of the male nor went through the male's backpack. Hooks testified that they did not take anything from the male because he did not have anything in his possession. Hooks testified that Martin let the male victim go, and the male started walking towards Lorain Avenue.

{¶35} Hooks testified that he walked with Martin, appellant, and the female victim behind K-Mart. Hooks testified that the female gave appellant oral sex while he and Martin were on the lookout for police. Hooks testified that the female proceeded to give him and Martin oral sex. Hooks testified that appellant started having vaginal sex with the victim while she was giving Martin oral sex. Hooks testified that appellant "pulled out" and ejaculated on the ground. Hooks testified that both he and Martin ejaculated in the female's mouth.

**{¶36}** Hooks testified that the police pulled up behind K-Mart and were flashing their lights. Hooks testified that he and Martin remained at the scene, but that appellant ran westbound out of the woods. Hooks testified that Martin threw his gun when the police pulled up. Hooks testified that officers patted him down and recovered a cell phone belonging to the female. Hooks testified that the officers recovered the gun that Martin tossed. Hooks testified that officers brought the male victim back to the scene to identify who had robbed him.

**{¶37}** Hooks testified that officers arrested him and Martin. Hooks testified that he gave a statement to Detective Vowell following the arrest. Hooks testified that he told Detective Vowell that Martin's cousin was the third male involved and that he did not know the cousin's name. Hooks testified that this initial statement was a lie. Hooks told the detective that the males did not go to the west side planning to rob anybody, and that he did not know what Martin and the third male planned to do until it happened. Hooks also testified that this was a lie. Hooks testified that he did not tell the detective that appellant was the third male during his first statement because "I don't want to get him caught or nothing" and "[because] he got away[.]" Hooks testified that he gave the detective a second statement in July, during which he identified appellant as the third individual in the June 30, 2014 incident. Hooks testified that after giving his first statement, he "just wanted to tell the truth." Hooks testified that he identified appellant from photographs presented by the officers.

**{¶38}** Hooks testified that he spoke with his brother, Ronald Hooks, who also goes by "Pooh," immediately following his arrest. Hooks testified that he told his brother what happened on the night of June 29 and the morning of June 30, 2014. Hooks testified that he told his brother that he was with "RJ" — appellant — when the incident took place. Hooks testified that he told his brother that he was with appellant on the night of the incident before he told Detective Vowell during his second statement. Hooks testified that he was aware that those conversations are recorded.

**{¶39}** Hooks testified that he lied to the judge when he pled guilty. Hooks explained that he pled guilty because he wanted to avoid going to trial where he could possibly be found guilty of more charges.

### 2. Circumstantial Evidence

**{¶40}** The Ohio Supreme Court "has 'long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990). The question is whether the state presented sufficient evidence that, if believed, would support the jury's convictions of murder and felonious assault beyond a reasonable doubt.

**{¶41}** The state's theory of the case was that (1) appellant robbed the female victim, and Hooks and Martin robbed the male victim, (2) appellant raped the female

victim, both orally and vaginally, and Hooks and Martin orally raped the female victim, (3) Hooks and Martin surrendered to the officers who arrived at the scene, and (4) appellant fled the scene, running west out of the woods behind K-Mart towards West 150th Street and then southbound on West 150th Street, with a gun in his possession. The state presented evidence, if believed, that would support that theory. Therefore, the evidence was sufficient to support the conviction.

{¶42} First, the state presented the testimony of the female victim. The female victim testified that males 1, 2, and 3 were all present when she first saw the police officers approaching the woods behind K-Mart. However, she testified that male 1 got away, running west out of the woods towards West 150th Street. She testified that males 2 and 3 remained in the woods and attempted to hide the gun. She testified that she was present when officers located the gun that the males attempted to hide. She testified that she did not know what happened to the second gun used during the attack, but guessed that male 1 had it with him when he ran away from the police. Thus, an inference could be made that appellant fled the scene with the second revolver and evaded the officers responding to the scene.

{¶43} Second, the state presented the testimony of Detective Vowell. Detective Vowell testified that during his first interview of codefendant Hooks, Hooks told him that a third male that he did not know was involved in the robbery and rape. However, Detective Vowell testified that he wanted to interview Hooks a second time after Hooks

placed a jail call to his brother. During the second interview with Hooks, Hooks provided appellant's name and nickname to Detective Vowell and identified appellant as the third individual involved in the June 30, 2014 attack. Detective Vowell testified that Hooks was not offered anything in exchange for his second statement.

{¶44} Detective Vowell testified that during a third interview of Hooks, Hooks identified a picture of appellant as the third male involved in the incident Detective Vowell testified that Hooks was not promised anything in exchange for his statement.

{¶45} Detective Vowell testified that after learning appellant's name, he searched for additional information on appellant using Facebook. Detective Vowell testified that he found the following post on appellant's Facebook page:

> Man, damn, man. Why didn't y'all run when told y'all to run. Now I won't see y'all niggas for a minute. Man, y'all niggas was squad. I'm going to miss y'all niggas. I love y'all niggas. Man no homo. Free Dante. Free Dugga. Some Kinsman savages.

Detective Vowell testified that the post was dated June 30, 2014 — the same day that the robbery and rape took place.

{¶46} Detective Vowell testified that during an interview of codefendant Martin, Martin described the events that took place on June 30, 2014 and indicated he was with appellant.

{¶47} Detective Vowell testified that officers returned to the crime scene during daylight hours to search for physical evidence. Detective Vowell testified that officers could not find the sandwich bag that appellant supposedly used as a condom because

there was so much trash in the area. Detective Vowell explained that "there was garbage everywhere" including beer bottles and cans left behind by people partying. Furthermore, Detective Vowell testified that officers were unable to find a second gun that was used during the attack. Thus, an inference could be made that appellant fled the scene with the second gun.

{¶48} Third, the state presented the testimony of Officer Davis. Officer Davis testified that he responded to a call regarding a robbery at West 150th Street and Lorain Avenue and began looking for suspects:

> We went to the area of West 150th and Lorain. We had a good indication that suspects were fleeing the area, going southbound from that area, West 150th and Lorain.

{¶49} Officer Davis observed a "black male in his early twenties" walking out from behind the VFW hall that is just south of the K-Mart. Officer Davis testified that he pulled over and ordered the male to stop. Officer Davis testified that as he and his partner exited the police cruiser and began walking towards the male, the male "took off running" southbound. Officer Davis testified that officers searched for the male for roughly an hour, but were unable to track him down. Thus, an inference could be made that appellant fled the scene and evaded the officers, including Officer Davis, that pursued him.

{¶50} Fourth, the state presented the testimony of Officer Kluth. Officer Kluth testified that the male victim flagged him down and informed him that three people robbed him and the female victim in the K-Mart parking lot.

{¶51} Fifth, the state presented the testimony of Detective Todd Marazzi. Detective Marazzi testified that he is assigned to the firearms forensic lab. Detective Marazzi testified that officers in the firearm forensics lab "test fire" guns that are confiscated in the city of Cleveland to determine whether the gun is operable. Detective Marazzi testified that he test-fired the .22 caliber revolver recovered by officers and found that the firearm was operable.

{¶52} Sixth, the state presented the testimony of SANE Lisa Clark. Clark testified that the female victim reported three men forcing her to perform oral sex. Clark testified that she met with the female victim on June 30, 2014. Clark testified that the victim arrived at the hospital at 3:52 a.m. and that she evaluated the victim at 4:55 a.m. Clark testified that the victim gave her an oral statement of the attack and that she took notes as the victim was giving her statement. Clark's report indicates the following details from the victim's statement: (1) the victim was assaulted by three assailants, (2) there was vaginal penetration by penis, (3) there was neither vaginal penetration by fingers nor anal penetration, and (4) there was oral contact between the assailants' genitals and the victim's mouth.

{¶53} Clark testified that she performed a rape kit on the victim. Clark testified

that during the rape kit, the victim declined a speculum vaginal exam, which she considers to be the most invasive procedure during the rape kit.

**{¶54}** Clark testified that before she met with the victim, the victim saw Nurse Christine Davis and Dr. Thomas Higgins. Clark acknowledged that a "past medical history" report authored by Dr. Thomas Higgins states that there was no vaginal or rectal penetration. Furthermore, Dr. Higgins' report indicates that the victim has a past medical history of a psychiatric disorder and drug abuse and dependence. Clark testified that a SANE nurse is responsible for taking the most detailed account of what happened to the patient.

**{¶55}** Count 10, having weapons while under disability, was tried to the trial court. The trial court found beyond a reasonable doubt that appellant was guilty of having weapons while under disability. In CR-14-582604, appellant pled guilty to attempted robbery in violation of R.C. 2911.02(A)(3). The trial court found that Martin's and Hooks' testimony regarding appellant's involvement in the June 30, 2014 incident was credible. Furthermore, based on the female victim's testimony, the trial court found that appellant was in possession of a revolver, and used the revolver during the attack of the female victim.

**{¶56}** After reviewing the record, and viewing the evidence in a light most favorable to the state, we find that a rational jury could have determined beyond a reasonable doubt that appellant was guilty of rape, aggravated robbery, kidnapping, and

having weapons while under disability. Accordingly, appellant's first assignment of error is overruled.

## B. Manifest Weight

**{¶57}** In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion rather than production. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When considering a claim that a conviction is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of conflicting testimony." *Thompkins* at 387. The weight-of-the-evidence standard "addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387.

**{¶58}** This court reviews the entire record, weighs the evidence and all reasonable inferences, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of the witnesses is primarily for the trier of fact to assess. *State v. Bradley*,

8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to make credibility determinations because this court cannot view the demeanor of a witness while testifying. Therefore, the trier of fact is in the best position to determine if the proffered testimony is credible. *State v. Holloway*, 8th Dist. Cuyahoga No. 101289, 2015-Ohio-1015, ¶ 42, citing *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶59} Appellant argues that the female victim, Martin, and Hooks are not credible witnesses.

{¶60} First, appellant argues that the female victim is not a credible witness, and that her criminal record involving prostitution and drugs casts doubt on the veracity of her testimony. Furthermore, appellant contends that the female victim's testimony is inconsistent.

{¶61} Appellant argues that the victim's testimony is contradicted by the testimony of Oblock's DNA analysis. In making this argument, we note that appellant mischaracterizes Oblock's testimony. Oblock testified that appellant was not a contributor to the DNA profiles recovered from the victim. He did not testify, as appellant claims, that appellant "had no involvement in whatever happened that night."

**{¶62}** After reviewing the record, we find that the important aspect's of the victim's testimony remained largely consistent over time, including: (1) she was attacked by three males, (2) one man robbed her at gunpoint, (3) the three attackers had oral and vaginal sex with her while the weapons were still in their possession, and (4) one of the thee attackers got away when the police arrived. Furthermore, the victim testified that she did not use drugs on the day of the attack, and was not under the influence of any drugs at the time of the attack. The victim testified that she had two cans of beer between the night of June 29 and the morning of June 30, 2014. The victim testified that she told the medical staff at Fairview Hospital that she used marijuana and cocaine the day before the attack. The victim testified that she was using Suboxone to treat her heroin addiction at the time of the incident. The victim acknowledged that her medical records reflect drug use, including cocaine, heroin, and marijuana, and also indicate that she is a "recovering alcoholic."

**{¶63}** SANE nurse Clark testified that the medical records' notation that the female victim used cocaine and marijuana "this morning" is not accurate. Clark explained that the medical records indicate that the date the victim used the cocaine and marijuana was June 21, 2014.

**{¶64}** Second, appellant argues that codefendants Martin and Hooks are not credible witnesses, as they received favorable plea deals and sentences in exchange for their testimony against appellant.

**{¶65}** We initially note that while Martin and Hooks had already pled guilty to reduced charges at the time they testified against appellant, they had not yet been sentenced.

**{¶66}** In *State v. Holloway*, 8th Dist. Cuyahoga No. 101289, 2015-Ohio-1015, defendant-appellant, arguing that his convictions were against the manifest weight of the evidence, challenged the credibility of the testimony of two jailhouse informants that testified for the state. *Id*. at ¶ 39. Appellant argued that the informants "cooperated with the state and lied on the witness stand in exchange for a better plea deal because they both were in county jail facing serious charges." *Id*. at ¶ 43. In holding that appellant's convictions were not against the manifest weight of the evidence, this court explained:

> While [the informants] may have had ulterior motives when contacting the prosecutor, the jury observed [their] appearance and demeanor, heard the testimony about their prior criminal histories and the plea deals they received, and found their testimony to be credible.

*Id*. at ¶ 44.

**{¶67}** Like *Holloway*, we find that the jury in the instant matter had sufficient information to judge the credibility of codefendants Martin and Hooks. Both Martin and Hooks testified about their respective (1) criminal backgrounds, (2) plea deals with the state in exchange for testimony against appellant, and (3) involvement in the June 30, 2014 incident. Furthermore, the jury heard questionable testimony from Martin and Hooks and testimony regarding their self-serving motivations. Finally, defense counsel

also brought to the jury's attention the inconsistencies between Martin's and Hooks' testimony and their statements to Detective Vowell.

**{¶68}** The jury was in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining a witness's credibility. *State v. Clark*, 8th Dist. Cuyahoga No. 94050, 2010-Ohio-4354, ¶ 17, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996), and *State v. Antill*, 176 Ohio St. 61, 66, 197 N.E.2d 548 (1964). Furthermore, the jury had sufficient information to judge each witness's credibility and "was free to believe all, part, or none of the testimony of each witness." *State v. Colvin*, 10th Dist. Franklin No. 04AP-421, 2005-Ohio-1448, ¶ 34; *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, ¶ 16. The evidence — including the eyewitness testimony, circumstantial evidence, and appellant's Facebook post — does not weigh heavily against appellant's convictions. Furthermore, we cannot say that this is the exceptional case where the jury clearly lost their way and created a manifest miscarriage of justice.

**{¶69}** Appellant's second assignment of error is overruled.

### C. Facebook Evidence

**{¶70}** In his third assignment of error, appellant argues that the trial court erred by admitting a Facebook post that was (1) not properly authenticated and (2) inadmissible hearsay.

**{¶71}** First, appellant argues that there was "no authentication whatsoever" of the

Facebook posts admitted by the trial court.   We disagree.

**{¶72}** The trial court admitted appellant's Facebook page into evidence over his objection that the Facebook page was not properly authenticated.   The trial court overruled appellant's objection, stating:

> There has been testimony sufficient to support, if believed, that it is what it purports to be.   As a result, that objection is overruled. [The Facebook page] is admitted over objection.

The decision to admit or exclude evidence rests within the trial court's sound discretion. *State v. McGuire*, 80 Ohio St.3d 390, 400-401, 686 N.E.2d 1112 (1997).   Thus, a reviewing court will not reverse the trial court's decision absent an abuse of discretion.

**{¶73}** Evid.R. 901 provides a liberal standard for the authentication of evidence. *State v. Pruitt*, 8th Dist. Cuyahoga No. 98080, 2012-Ohio-5418, ¶ 11, citing *State v. Teague*, 8th Dist. Cuyahoga No. 90801, 2009-Ohio-129.   Under Evid.R. 901(A), the requirement of authentication for evidence to be admissible "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This court has stated:

> "Circumstantial evidence, as well as direct, may be used to show authenticity.   *State v. Williams*, supra, 64 Ohio App.2d 271, 274, 413 N.E.2d 1212 (8th Dist. 1979).   Moreover, the threshold standard for authenticating evidence pursuant to Evid.R. 901(A) is low, and 'does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be.'   *State v. Easter*, 75 Ohio App.3d 22, 25, 598 N.E.2d 845 (4th Dist. 1991)."   *State v. Trice*, 8th Dist. Cuyahoga No. 89933, 2008-Ohio-2930, ¶ 22.

*Pruitt* at ¶ 11, quoting *Teague* at ¶ 7.

**{¶74}** In the instant case, Detective Vowell and codefendant Martin authenticated the Facebook post by direct testimony.

**{¶75}** Detective Vowell testified that after learning the third suspect's name from Hooks, he searched for additional information on the suspect using Facebook. Detective Vowell discovered and reviewed appellant's Facebook page.

**{¶76}** Detective Vowell testified that he is familiar with Facebook. Furthermore, Detective Vowell testified in detail about: (1) the difference between Facebook accounts that are open to the public and private accounts, (2) using privacy settings to restrict the information that is available to the public, (3) the process of "tagging" Facebook users in a post or picture, and (4) the process of executing a search warrant for a Facebook page. Detective Vowell testified that he generated a report based on his findings on Facebook.

**{¶77}** Detective Vowell testified that he located the Facebook accounts of appellant and his codefendants. Detective Vowell testified that both Hooks and Martin had portions of their Facebook profiles that could be viewed by the public. Detective Vowell testified that Hooks's profile name is "Kinsman Avenue Savage Dugga" and codefendant Martin's profile name is "Dante Devane Martin." Furthermore, Detective Vowell testified that he observed a reference to the "Gunna" gang on Martin's Facebook profile.

**{¶78}** Detective Vowell testified that appellant's entire Facebook profile was open

to the public. Detective Vowell testified that appellant's Facebook profile name was "RJ Kinsman Savage Inkton." Detective Vowell testified that appellant used a picture of himself for his account's profile picture. Detective Vowell testified that Hooks and Martin were "Facebook friends" with appellant. Detective Vowell testified that there were "numerous" pictures on appellant's Facebook page and that he was able to determine that appellant was in fact that person in the pictures.

{¶79} Detective Vowell testified that he found the following post on appellant's Facebook page:

> Man, damn, man. Why didn't y'all run when told y'all to run. Now I won't see y'all niggas for a minute. Man, y'all niggas was squad. I'm going to miss y'all niggas. I love y'all niggas. Man no homo. Free Dante. Free Dugga. Some Kinsman savages.

{¶80} Detective Vowell testified that appellant's profile picture and profile name appeared at the top of the post. Detective Vowell testified that the post was dated June 30, 2014 — the same day that the robbery and rape took place. However, Detective Vowell testified that there is no indication of what time the post was posted and that he did not verify the date of the posting with Facebook technicians. Detective Vowell testified that the first comment responding to the post was posted on June 30, 2014 at 6:47 a.m. Detective Vowell testified that he is familiar with Facebook, and that a Facebook user cannot respond to a post before it has been posted. Detective Vowell testified that he has accessed appellant's Facebook page since the time he first saw it and confirmed that the post is still on the page with the June 30, 2014 date. Detective

Vowell testified that based on his knowledge and investigation of the Facebook post, nothing about the post is inaccurate.

**{¶81}** Detective Vowell testified that he obtained search warrants for parts of the Facebook pages that are not accessible to the public. Detective Vowell testified that he obtained the official Facebook records for the accounts belonging to appellant, Hooks, and Martin.

**{¶82}** Martin testified that Hooks goes by "Kinsman Finest Dugga" on Facebook. Martin testified that he was Facebook friends with appellant in June 2014. Martin testified that appellant goes by the name "RJ" and that appellant's Facebook name was "RJ Kinsman's Savage Inkton." Martin testified that appellant was in the profile picture corresponding with the posting at issue. Martin testified that appellant ran when the police showed up in the woods behind K-Mart, and that neither he nor Hooks ran from the police.

**{¶83}** Although codefendant Hooks testified that he did not know whether appellant had a Facebook page, Hooks — like Martin — testified that appellant goes by the name "RJ."

**{¶84}** We find that the direct testimony of Detective Vowell and codefendant Martin satisfied the requirement of authentication for the Facebook post under Evid.R. 901(A).

**{¶85}** Furthermore, appellant, relying on *State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-13-1223, 2015-Ohio-1679, insinuates that a fictitious individual created the Facebook account and posted the message at issue. There is no support for this argument in the record, and appellant's reliance on *Gibson* is misplaced.

**{¶86}** In *Gibson*, the Sixth District addressed authentication concerns regarding content obtained from Facebook:

> Facebook users often "post content — which can include text, pictures, or videos — to that user's profile page" delivering it to the user's subscribers. *Parker v. State*, 85 A.3d 682, 686 (Del.2014). These posts often include information relevant to a criminal prosecution: "party admissions, inculpatory or exculpatory photos, or online communication between users." *Id*. Authentication concerns arise in regard to printouts from Facebook "because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password," and, consequently, "[t]he potential for fabricating or tampering with electronically stored information on a social networking sight" is high. *Griffin v. State*, 419 Md. 343, 19 A.3d 415, 421 (2011). See also *Campbell v. State*, 382 S.W.3d 545, 550 (Tex.App.2012) ("Facebook presents an authentication concern * * * because anyone can establish a fictitious profile under any name, the person viewing the profile has no way of knowing whether the profile is legitimate."); *Smith v. State*, 136 So.3d 424, 433 (Miss.2014) (in regard to Facebook, authentication concerns arise "because anyone can create a fictitious account and masquerade under another person's name.").

*Id*. at ¶ 35.

**{¶87}** In the instant matter, there is neither evidence that a fictitious individual created the account under appellant's name nor that the information on appellant's page was fabricated or tampered with. Assuming, arguendo, that an unrelated individual created the account under appellant's name, appellant has made no effort to report the

incident to the Facebook Help Center. Furthermore, assuming, arguendo, that the posting was the product of fabrication or tampering, appellant has neither made an effort to remove the posting from his Facebook page nor modified his privacy settings to limit the public's access to the posting.

{¶88} Second, appellant argues that the Facebook post is inadmissible hearsay. We disagree.

{¶89} Evid.R. 801(_) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Furthermore, Evid. R. 801(D)(2), admission by a party-opponent, provides that a statement is not hearsay if "the statement is offered against a party and is (a) the party's own statement, in either an individual or a representative capacity[.]"

{¶90} In the instant matter, the Facebook post in question is admissible as a statement by a party-opponent. The evidence supports that appellant posted the message on his Facebook page sometime before 6:47 a.m. on June 30, 2014. Furthermore, the evidence supports that the account on which the message was posted belongs to appellant. Thus, we find that the Facebook post was not inadmissable hearsay.

{¶91} After reviewing the record, we find that the trial court did not abuse its discretion in admitting the Facebook post into evidence. The testimony of Detective Vowell and codefendant Martin satisfied the requirement of authentication for the Facebook posting. Accordingly, appellant's third assignment of error is overruled.

### III. Conclusion

**{¶92}** We find that the state's evidence, if believed, was sufficient to support appellant's convictions for rape, aggravated robbery, kidnapping, and having weapons while under disability. Furthermore, after reviewing the entire record, weighing all of the evidence and considering the credibility of witnesses, we find that this was not the exceptional case where the "jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 81.

**{¶93}** We find that the testimony of Detective Vowell and codefendant Martin properly authenticated the Facebook post under Evid.R. 901(A). Furthermore, we find that the Facebook post was admissible under Evid.R. 801(D)(2) as an admission by a party-opponent. Thus, we find that the trial court did not abuse its discretion in admitting the Facebook post into evidence.

**{¶94}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of

the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., JUDGE

EILEEN T. GALLAGHER, P.J., and
MELODY J. STEWART, J., CONCUR