[Cite as *State v. Ford*, 2018-Ohio-2128.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105698**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**JARRELL ST. ANTHONY FORD**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-612720-A

**BEFORE:** Kilbane, J., E.A. Gallagher, A.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** May 31, 2018

**ATTORNEY FOR APPELLANT**

Erin R. Flanagan
Erin R. Flanagan, Esq., Ltd.
75 Public Square, Suite 920
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
Timothy R. Troup
Assistant County Prosecutor
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113


MARY EILEEN KILBANE, P.J.:

{¶1}  Defendant-appellant, Jarrell St. Anthony Ford ("Ford"), appeals his convictions. For the reasons set forth below, we affirm.

{¶2}  In December 2016, Ford was charged in a 20-count indictment along with codefendant, Donshawn Haywood ("Haywood"). The charges arise from his involvement with Haywood and a juvenile, J.W., in the aggravated robbery of Jaquan Martin ("Martin") and the associated intimidation of a witness, Onyinyechi Onugha ("Onugha"). Counts 1 and 2 charged Ford with aggravated robbery. Counts 3-5 charged him with robbery. Counts 6 and 7 charged him with felonious assault.[1] Martin is the victim named in Counts 1-7. Count 8 charged Ford with the felonious assault of Onugha.[2] Count 9 charged him with carrying a concealed weapon

---

[1]Each of Counts 1-7 carried a one- and three-year firearm specification and two forfeiture specifications.

[2]Onugha is also listed as the victim in Counts 11, 17, and 19.

with two forfeiture specifications. Count 10 charged him with the improper handling of a firearm in a motor vehicle.[3] Count 11 charged him with the intimidation of a witness. Counts 12 and 13 charged him with the failure to comply. Count 14 charged him with vandalism. Count 15 charged him obstructing official business. Count 16 charged him with disrupting public service. Count 17 charged him with criminal damaging.[4] Count 18 charged him with resisting arrest. Counts 19 and 20 charged him with discharge of a firearm on or near prohibited premises.[5]

{¶3} The matter proceeded to a jury trial, at which the following evidence was adduced.

{¶4} On July 22, 2016, at approximately 11:30 p.m., Martin was waiting at a bus stop in Euclid, Ohio, when a car driven by Ford pulled up near the bus stop. Haywood and J.W. exited the car and began to assault Martin. Haywood pointed a gun at Martin, punched him, and knocked him to the ground. J.W. also punched and kicked Martin. During the assault, Ford brandished a firearm while walking in the street. He fired his gun, which caused a car driven by Onugha to veer off the street and crash into a condominium building. The three men then returned to their car and fled the scene.

{¶5} Martin then called 911. While on the phone with the 911 operator, the car driven by Ford returned, and Haywood and J.W. assaulted Martin again. The attackers returned to their car again and fled the scene for the second time. The incident was recorded by a video

---

[3]Each of Counts 9 and 10 carried two forfeiture specifications.

[4]Each of Counts 12-15 and 17 carried a furthermore clause.

[5]Counts 8, 19, and 20 each carried a one- and three-year firearm specification and a forfeiture specification.

surveillance system, which was played for the jury. Martin was treated for his injuries at Euclid Hospital. He received 15 staples in his head and 9 sutures in his eyebrow.

{¶6} Euclid police located the car driven by Ford several minutes after the second assault. Euclid Police Officer Christian Studly assisted Euclid Police Officer Kyle Flagg in a high-speed chase, pursuing the vehicle driven by Ford. The chase ended when Ford lost control of the car and crashed. All three males fled on foot. Officer Flagg testified that he apprehended Ford within minutes and returned Ford to Officer Studly's vehicle.

{¶7} Haywood and J.W. were apprehended a short time later. A semiautomatic handgun belonging to Ford was located on the driver's side of the vehicle, and a backpack containing an inoperable revolver and the identification card of Haywood was located on the front passenger side of the vehicle. DNA analysis confirmed that Martin's blood was found on the shirt worn by J.W. DNA analysis also confirmed that a hat found at the scene belonged to Haywood.

{¶8} After the conclusion of trial, the jury convicted Ford of Counts 1 through 18 and all of the attendant specifications. Ford was sentenced to a total of 11 years and 9 months in prison and ordered to pay $9,338.95 as restitution to Martin.

{¶9} Ford now appeals, raising the following three assignments of error for review.

### Assignment of Error One

The trial court erred in denying Ford's *Batson* challenges to the State's peremptory strikes of two African-American panelists.

### Assignment of Error Two

The trial court improperly admitted hearsay testimony to Ford's prejudice.

### Assignment of Error Three

Ford was denied effective assistance of counsel, in violation of his Sixth Amendment rights under the United States Constitution.

### *Batson* Challenge

{¶10} In the first assignment of error, Ford argues the trial court erred by failing to properly inquire into the state's race neutral reasons for peremptorily striking two prospective African-American jurors from the panel — Prospective Juror No. 8 and Prospective Juror No. 12.

{¶11} In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court recognized that the Equal Protection Clause of the United States Constitution prohibits the use of peremptory challenges in a discriminatory manner to exclude potential jurors solely on account of their race. *Id.* at 89; *see also State v. Hernandez*, 63 Ohio St.3d 577, 581, 589 N.E.2d 1310 (1992).

{¶12} There are three steps involved in adjudicating a *Batson* claim. As the Ohio Supreme Court in *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, stated:

> First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Batson*, 476 U.S. at 96-98, 106 S.Ct. 1712, 90 L.Ed.2d 69. However, the "explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69. Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination. *Id.* at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. *See*, *also*, *Purkett v. Elem* (1995), 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834. A trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, following *Hernandez v. New York* (1991), 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395._

*Id.* at ¶ 106.

{¶13} We note that with the prima facie step, the trial court must "consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present." *Batson* at 96-97. At the second step of the inquiry, "'the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett* at 768, quoting *Hernandez,* 500 U.S. at 360; *see also State v. Gowdy*, 88 Ohio St.3d 387, 392, 2000-Ohio-355, 727 N.E.2d 579. "In step three, the trial court may not simply accept a proffered race-neutral reason at face value, but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65. Indeed, "'[t]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it.'" *Id.,* quoting *Miller-El v. Dretke*, 545 U.S. 231, 251-252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). The juror may not be excluded if the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge. *Id.*, citing *Miller-El*.

{¶14} In the instant case, the state's exercise of its peremptory challenges resulted in the removal of two African-American persons as jurors. First, Ford argues that with regard to prospective juror No. 8, the state offered implausible reasons for striking this prospective juror because the differences alleged by the state in this juror as compared to the empaneled white jurors were far from significant.

{¶15} When the state exercised its peremptory challenge to excuse prospective juror No. 8, defense counsel raised a *Batson* challenge. Upon this challenge, the court required the state to

provide a race-neutral reason for excusing the juror. The state indicated preliminarily that both of the jurors who it challenged for cause were white jurors. The state then stated that it had reservations about prospective juror No. 8 for the following reasons:

> [F]irst he seemed to have an overpowering personality. He was responsive to almost all questions and part of the calculation we make when we are selecting a panel is how that member will fit in with the other 11 members who are deliberating and the State does not want someone who has such an overpowering personality on the panel.
>
> Second, he seemed more demanding than any other juror in terms of wanting the police reports and transcripts. He was most reluctant to let go of that, said he really expected to receive that, and was more put off than other panelists about not having those.
>
> He seemed less sure of how to resolve discrepancies in memory between the jurors. I learned from my colleagues that he seemed dismissive after some interactions with me, that his body language was dismissive and off-putting.
>
> There's one other thing — and I considered asking him about this and elected not to, because frankly, I didn't want to contaminate him if he didn't already know this — but the company he works for, Rockwell Automation, my understanding is that their vice president and general counsel is [defense counsel's] spouse.

{¶16} In rejecting the *Batson* challenge with regard to this prospective juror, the court stated:

> I don't know how you would, as you say, contaminate the situation by asking him questions because certainly we asked questions of other individuals who know [the state's colleague] and [defense counsel], so I'm not sure that the basis for not inquiring of him is valid in terms of contamination[.]
>
> * * *
>
> I do not disagree with the statements made by [the state] as to [prospective juror No. 8]. He did have a very commanding personality. I watched him, his body language, his facial expressions. He did appear to be very concerned with not getting a transcript of the proceedings, or a transcript of any witness testimony, not quite happy with the answer that we just don't do that, wondering how a police officer or anyone actually could testify so many months or days later, certainly liked the fact that the Court advised that notes could be taken, but then he was very involved in the discussion as to whose notes do we believe.

Now, obviously I have an instruction for the jurors once they're impaneled as to how they are to evaluate and use those notes and nobody's notes are considered better than the memory of somebody, but I think [the state] explained that to the panel anyway.

* * *

I wasn't necessarily privy to looks by [prospective juror No. 8] towards [the State]. I did find it interesting that when you said, "Do you believe I have two dogs?" I think everybody else — well, you've asked that many times in voir dire before, and nobody says no. And this is just to show his sort of personality and how he sees things and how he's a little bit demanding and wants to get some attention I think. He wanted to make clear that, no, he didn't necessarily believe you, that you would have to show him proof — and I'm not saying that's a bad thing in the context of a trial with the State having to prove beyond a reasonable doubt before a conviction or before a jury could find the defendant guilty — but that just added to the flavor of his commanding testimony, like he's going to be in charge, so to speak, is the way I felt when he said it. I agree with you there.

So I'm going to allow the peremptory challenge. Your objection is noted. But otherwise, [prospective juror No. 8] will be excused by the State.

{¶17} Here, the state articulated the following race-neutral reasons for striking this prospective juror: (1) his overpowering personality; (2) his heightened demand for police reports and transcripts; (3) his uncertainty about resolving discrepancies in memory during deliberations; (4) his dismissive and off-putting body language; and (5) his employment at the same company where defense counsel's spouse served as vice-president and general counsel. The trial court then expressed on the record its reasons for rejecting the *Batson* challenge. The court discounted the state's fourth and fifth reasons, but found compelling the state's first reason. "When the explanation for a peremptory challenge 'invoke[s] a juror's demeanor,' the trial judge's 'firsthand observations' are of great importance." *Thaler v. Haynes*, 559 U.S. 43, 49, 130 S.Ct. 1171, 175 L.Ed.2d 1003 (2010), quoting *Synder v. Louisiana*, 552 U.S. 472, 477, 128

S.Ct. 1203, 170 L.Ed.2d 175 (2008). Based on the foregoing, we find that the trial court's determination was not clearly erroneous with regard to prospective juror No. 8.

{¶18} Next, with regard to prospective juror No. 12, Ford argues the trial court erred by not independently and explicitly assessing the credibility of the state's race-neutral reasons for excluding this prospective juror.

{¶19} A review of the record reveals that this prospective juror's sister is a Cuyahoga County assistant prosecuting attorney who told the assistant prosecuting attorney trying the case that she would not want her brother on a jury. She relayed this information to the prosecuting attorney outside of the courtroom, after voir dire had begun. Ford contends that while the trial court devoted considerable energy to exploring this exchange, it did not adjudicate whether the sister's opinion of her brother's potential performance on Ford's jury was a race-neutral reason for striking him. The exchange between the parties and the court regarding the removal of prospective juror No. 12 is as follows:

> [STATE]: There are a couple of reasons for excusing [prospective juror No. 12]. One is frankly he works at Murtis Taylor. We have a concern about having a social worker on the panel. The panelist who would be taking his spot is also an African American juror. So the next panelist to drop down into the box would be Panelist Number 20, who is also African American, and I'll tell the Court very frankly, I spoke to [my colleague] in our office, and she told me that she would not want her brother on a jury, that she did not —
>
> THE COURT: I don't know that I can consider that in terms of your justification.
>
> [STATE]: I'm saying that that informs my justification for striking him. This is not about his skin color. This is about frankly his sister's assessment of how he would be as a juror and whether he would critically and fairly evaluate the evidence.
>
> THE COURT: I'm not sure I can allow you to use somebody else's assessment who is not involved in this trial to inform the Court as a basis for excusing him. Certainly she wasn't present here; she's not involved in this case. We tell

everybody not to discuss this matter with anybody outside this courtroom. You had the opportunity to voir dire him individually. We all did. There was no for-cause challenge by the State or the defense, and you're saying that you're justifying your peremptory on the basis that [your colleague] told you she wouldn't want her brother as a juror. I don't know that that's a valid basis to respond to the *Batson* argument.

[STATE]: Your Honor, once they make a *Batson* challenge, if the Court finds that the juror that a party is striking —

THE COURT: I know that. I'm just talking about you talking to [your colleague] to tell you what she thinks about that particular juror, or panel member. I don't think it's appropriate. How can you be allowed to rely on what your fellow prosecutor told you who is not involved in this case who you're talking to at a break about your jury?

[STATE]: I spoke to her this morning to confirm that her brother was [prospective juror No. 12] who is on our jury. I asked her if that was her brother. She said yes. I don't remember her exact words, but she said she did not think that he would be a good juror, particularly for the State, and that she did not think he would critically evaluate the evidence, critically and fairly evaluate the evidence. Again, I don't remember her exact words, but our job is to proffer a race-neutral explanation for why we want to strike this juror, and I'm saying that is one of the components that is informing our decision to strike this juror.

THE COURT: [Defense Counsel]?

[DEFENSE COUNSEL]: I would add that by the same token that [the prosecuting attorney] went to his colleague, you know, we would have had an opportunity — I suppose [co-counsel] could have talked to his wife and said, "Hey, what do you know about Juror Number 8?" which he didn't do, and we didn't inquire of. We would not have dreamed of inquiring along that line.

I think if they wish to make that peremptory challenge, it may be grounds for a mistrial of this case because I think we have so selectively —

THE COURT: Grounds for a mistrial?

[DEFENSE COUNSEL]: I'm putting it out there to the Court. I realize we didn't begin in any way, but realize, we had a small panel — I was surprised to see the composition of the panel, the 26 people that were presented, and now if that peremptory challenge would stand, I think that on behalf of [Ford], I would say that we may be deprived of having a racially-neutral panel.

THE COURT: My concern with the State's response to your *Batson* challenge, they basically set forth two arguments, two reasons for — hold on. One is that he works at Murtis Taylor. They assume then that he's a social worker, but you never developed that in voir dire. You don't know specifically what kind of job he does at Murtis Taylor. He could be working as a janitor for Murtis Taylor. We don't know — or I don't know. [The colleague] may know. [The colleague] may have told you, but that never came out as far as I remember during the voir dire process specifically what his job was.

Independent of that, you've set forth the State's bases for exercising the peremptory, which is what his sister told you in communications with her this morning before we ever started.

My concern is number two, having those conversations with [your colleague]. I understand that all you're required to do is set forth a basis for exercising a peremptory challenge, but I'm not sure in the overall scheme of things that allowing that to be a basis when you get information from somebody outside of this courtroom and [not] through the voir dire process, that's my concern. Now, the Murtis Taylor thing, I don't know, but you didn't develop if he is a social worker or whatnot. We don't know what he does for Murtis Taylor. I don't think that ever came out.

[STATE]: We do. He said he was a child behavioral therapist.

THE COURT: So he's a child behavioral therapist, and so that, to you, means he's a social worker and that's your basis then independent of what [your colleague] told you.

[STATE]: Yes, and there are additional bases. We got a little sidetracked on [my colleague's] comment to me when I asked her if that was fact her brother. He has this — this feud * * * with [my colleague] * * * and we think that may influence how he views our office.

I understand he said he thinks he can be fair and impartial, but the fact that he has an ongoing feud with his own sister * * * gives us grave concern about his ability to be fair and impartial in this case.

Additionally, when I was asking questions of the entire panel, he was generally nonresponsive. He did respond to the one about experience with firearms. I think he couldn't help but respond to that, given that he is a marine veteran.

* * *

His responses when the Court asked about knowing anyone who works in law enforcement or knowing anyone who works in the court, his claim is that he didn't realize that [his sister] worked in the court, but he says he knows she's a

prosecutor, and for him not to respond when the Court is asking about people who work in law enforcement or work in the law or work in the court, I think that was concerning at least, and that's what prompted me to ask [my colleague] if that was in fact her brother. I thought it may have been happenstance that they had the same last name when he passed on all the questions about knowing people working in the court.

THE COURT: I did find that curious that the first time that I — I don't really concentrate so much on the names as I do on the numbers in terms of identifying them for purposes of the record, so I didn't notice the name yesterday — but when you advised that [your colleague] had told you that he was her brother, I was surprised that he had not mentioned that yesterday when I was inquiring of him. That's a valid concern.

The fact that he doesn't plan to talk with his sister for another two weeks, I can't quite figure out if he's toying about that whole situation, and I don't know what that means, if he's really mad at her, or if he's just sort of in control, I'll give her two weeks before I allow her to talk to me, which does show perhaps an animus against [your colleague]. I'm not sure if that extends to the prosecutor's office, but it might. He seemed to think it was sort of comical. That would be my concern with him.

Those are the best reasons you stated thus far.

I understand the Murtis Taylor situation combined therewith might be sufficient to withstand the *Batson* challenge, but the other issue is that you've evaluated it whereby [Panelist] Number 20, would replace him, or she would then be on the panel.

[STATE]: I just threw that out there as another factor for the Court to consider, Your Honor.
* * *

I'm going to deny the *Batson* challenge, but certainly that's preserved for appeal.

{¶20} Here, the state initially explained that it wanted to remove prospective juror No. 12 because it learned that this prospective juror was a sibling of a Cuyahoga County assistant prosecuting attorney, and the siblings were currently feuding with each other. The colleague told the prosecutor trying the case that she would not want her brother on a jury. The prosecutor initiated the conversation with his colleague because he recognized the juror's last name and

asked if they were related. Prospective juror No. 12 did not mention this during the first day of voir dire, despite being questioned about knowing anyone who works for the court or having friends or family members who were members of a law enforcement agency. Specifically, the trial court asked, "[d]o any of you know anyone that works for the court, the Cuyahoga County Court of Common Pleas? If so, raise your hand." The court also asked, "[d]o any of you have any family members or close friends or relatives who are police officers or members of a law enforcement agency? If so, please raise your hand[.]"

{¶21} The state additionally offered the juror's employment as a child therapist and the feud possibly influencing how this prospective juror views the prosecutor's office as reasons for striking the juror from the panel. The state pointed out that prospective juror No. 12 would be replaced by another African-American panelist.

{¶22} While we are concerned by the state's revelation of the family feud during voir dire, we do not find the trial court's findings clearly erroneous. "This Court gives deference to the trial court's ruling on a *Batson* issue, which is mainly an evaluation of credibility." *State v. Boynton*, 8th Dist. Cuyahoga No. 93598, 2010-Ohio-4248, ¶ 12, citing *State v. Murphy*, 91 Ohio St.3d 516, 530, 2001-Ohio-112, 747 N.E.2d 765. "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Miller-El*, 537 U.S. at 339, 123 S.Ct. 1029, 154 L.Ed.2d 931.

{¶23} In the instant case, the trial court, as the gatekeeper in a *Batson* challenge, set forth a lengthy analysis in deciding to deny the challenge. Under *Batson*, the state had to build a record that legitimately demonstrated its articulated concern. The court accepted the state's concern that prospective juror No. 12 was not forthright to a number of questions, such as

knowing anyone who works for the court or having any family members in law enforcement. The court stated that it was surprised that the prospective juror "had not mentioned that yesterday when I was inquiring of him. That's a valid concern." The court, however, did not accept the prosecutor's justification regarding his colleague's concerns and the colleague's family feud with prospective juror No. 12. The court stated, "I'm just talking about you talking to [your colleague] to tell you what she thinks about that particular juror, or panel member. I don't think it's appropriate." The court further stated:

> The fact that he doesn't plan to talk with his sister for another two weeks, I can't quite figure out if he's toying about that whole situation, and I don't know what that means, if he's really mad at her, or if he's just sort of in control, I'll give her two weeks before I allow her to talk to me, which does show perhaps an animus against [your colleague]. I'm not sure if that extends to the prosecutor's office, but it might. He seemed to think it was sort of comical. That would be my concern with him.

{¶24} The trial court also considered prospective juror No. 12's employment, in conjunction with the fact that prospective juror No. 12 would be replaced by another African-American juror when it decided to deny the *Batson* challenge.

{¶25} Based on the foregoing, it is evident that the court assessed the plausibility of the state's concerns and found the fact that prospective juror No. 12 was not forthright with respect to his sister's employment as a prosecutor, his possible animus toward the prosecutor's office, in conjunction with his job and the fact that he would be replaced by an African-American juror, sufficient to withstand Ford's *Batson* challenge.

{¶26} Under the totality of these circumstances, the concerns the court relied on represented a race-neutral explanation and were based upon something other than the race of the juror, even though the state offered to the court on the record that prospective juror No. 12 was feuding with his sister at the time of the voir dire.

**{¶27}** Therefore, the first assignment of error is overruled.

Hearsay Testimony

**{¶28}** In the second assignment of error, Ford argues the trial court erred when it allowed extensive hearsay testimony from the state's witness. In particular, he claims Lynise Adams ("Adams") was allowed to provide her recollection of Onugha's comments after Onugha's car crashed. The trial court, after a sidebar outside of the presence of the jury, admitted Adams's testimony as excited utterance under Evid.R. 803(2).

**{¶29}** Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). Whenever the state seeks to introduce hearsay into evidence in a criminal proceeding, the court must determine whether the evidence fits within an exception to the hearsay rule. *State v. Kilbane*, 8th Dist. Cuyahoga No. 99485, 2014-Ohio-1228, ¶ 29.

**{¶30}** Evid.R. 803(2) provides an exception to the hearsay rule if the out-of-court statement constituted an "excited utterance," which the rule defines as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "Reactive excited statements are considered more trustworthy than hearsay generally on the dual grounds that, first, the stimulus renders the declarant incapable of fabrication and, second, the impression on the declarant's memory at the time of the statement is still fresh and intense." *State v. Taylor*, 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (1993).

**{¶31}** To qualify as an "excited utterance" the following four factors must be established:

> (a) that there was some occurrence startling enough_ to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before

there had been time for such nervous excitement to lose a domination over declarant's reflective faculties so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

*Potter v. Baker*, 162 Ohio St. 488, 500-501, 124 N.E.2d 140 (1955). "The controlling factor comes down to whether the declaration resulted from impulse as opposed to reason and reflection. *State v. Nixon*, 12th Dist. Warren No. CA2011-11-116, 2012-Ohio-1292, ¶ 13." *State v. Houston*, 2017-Ohio-4179, 92 N.E.3d 176, ¶ 50 (8th Dist.). The Ohio Supreme Court also held that there is no per se amount of time after which a statement is no longer considered to be an excited utterance. *Taylor* at 303.

{¶32} We review a trial court's evidentiary rulings for abuse of discretion. *State v. Long*, 53 Ohio St.2d 91, 98, 372 N.E.2d 804 (1978).

{¶33} Here, Adams testified that within a few minutes after the crash, she went outside and approached Onugha who "was in shock * * * [s]haken, disoriented. She was crying and * * * at first she wasn't speaking any English. Then [my neighbor and I] kept asking her was she okay, and then she started speaking English." The state then asked Adams if Onugha was "able to tell you anything about what had just happened to her?" Defense counsel objected, and the court held a discussion at sidebar. The trial court overruled the objection, stating:

I do believe that [the state has] already established that this would be an excited utterance given the testimony that you elicited from her to include that she approached the driver in the car within minutes of hearing the crash, the driver was in shock, shaken, disoriented, crying, speaking in a different language initially, and then finally answering questions in English. So I think you've established the excited utterance exception to the hearsay.

{¶34} Adams then testified:

As [Onugha] walked up to us, she just kept saying there was a gun in her face, there was a gun in her face, and we got her to sit down on the steps and she told us that as she came up to the intersection, that somebody reached — her window was

down, he reached into her car and pointed a gun at her and started shooting through her driver's door, through the passenger door, out the other side, and then pulled it back out, told her to get out of the way and that's when she threw the car in reverse and tried to get out of the way.

{¶35} On redirect, Adams admitted to the state that she did not remember Onugha's exact words. The state asked Adams,

[t]he questions defense counsel asked about what the driver of this crashed vehicle told you, do you remember the exact words that she used when she was describing where the gun was pointed, how the gun was fired, or [are these] her words, or your interpretation, your impression of what she said?

Adams replied, "I don't remember her exact words, but from what she said, that's how I interpreted it." Defense counsel objected, and the trial court overruled the objection. At sidebar, the court stated that it would strike the inquiry and answer and instruct the jury to disregard the testimony. In doing so, the court stated:

THE COURT: Certainly she testified both on direct and on cross-examination that what she remembers is the victim, we'll call her, actually saying to her at that time that the man put a gun in through the driver's window, shot it through the passenger door and then basically there were a couple other things, but ran off.

When you asked her that last question, you changed it up. In other words, you said, "Well, is it possible? In other words, is that your interpretation of what she said?"

So if you're asking me to strike that last inquiry and answer, I can do that.

[DEFENSE COUNSEL]: But you can't unring a bell, right?

THE COURT: You can't unring a bell, but I can instruct them to disregard that testimony because she was consistent in both direct and cross-examination, and but for how you asked that question, she seemed pretty confident about her testimony. I think the fact that you asked it made her try to reevaluate what she had said. Otherwise, she's consistent in what she said both on direct and

cross-examination. She said it both times. I know that you were trying to rehabilitate her to the extent that it may differ between what you thought she would testify to about standing in the street pointing a gun at her, but she was consistent with your question and that of [defense counsel] in saying what she said. So you got to take her testimony as is, if you want that excited utterance.

{¶36} Ford contends that the court erred because Adams's testimony did not establish part (b) of the *Potter* test — that any initial "nervous excitement" exhibited by Onugha continued to remain sufficient to make her statements and declarations the unreflective and sincere expression of her actual impressions and beliefs. He further contends that the trial court's allowance of this testimony, compounded by its instruction to the jury to disregard Adams's admission that the "shots into the car" testimony might have been her interpretation of Onugha's story was prejudicial error.

{¶37} A review of this testimony reveals that Onugha made these statements almost immediately after Ford shot at her and caused her to crash her vehicle. It is understandable that she would be in a state of nervous excitement after the incident. We do not find these statements to be the product of reflective thought because of the short time span between the shooting and the statements and Onugha's continued state of shock. Furthermore, Adams's testimony regarding Onugha's statements is admissible even if she did not remember the exact words Onugha used because Adams was consistent with what she said in both direct and cross-examination. The trial court acknowledged that "her interpretation" was a direct response to the state's questioning and then struck that question and response from the record. The trial court instructed the jury to "completely disregard the last question or questions asked by [the state] during * * * redirect examination, and this witness's response or responses to those

questions." We note that curative instructions are presumed to be an effective way to remedy errors that occur during trial. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2000). "A presumption exists that a jury follows the instructions given to it by the trial court." *State v. Carter*, 8th Dist. Cuyahoga No. 104653, 2017-Ohio-5573, ¶ 43, citing *State v. Glover*, 10th Dist. Franklin No. 07AP-832, 2008-Ohio-4255, ¶ 80.

{¶38} Therefore, the second assignment of error is overruled.

Ineffective Assistance of Counsel

{¶39} In the third assignment of error, Ford argues he was denied effective assistance of counsel when defense counsel stipulated to the state calling Onugha as the court's witness under Evid.R. 614(A) and the introduction of telephone calls allegedly made by Ford from the Cuyahoga County Jail through Euclid Police Detective Joshua Schultz ("Detective Schultz").

{¶40} In order to establish ineffective assistance of counsel, Ford must demonstrate (1) that counsel's performance fell below an objective standard of reasonable representation, and (2) that he was prejudiced by that performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694.

{¶41} In evaluating a claim of ineffective assistance of counsel, there is a strong presumption that counsel's conduct in question fell within a wide range of reasonable professional assistance. *State v. Singleton*, 8th Dist. Cuyahoga No. 98301, 2013-Ohio-1440, ¶ 67; *Strickland*. As a result, trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980), citing

*People v. Miller*, 7 Cal.3d 562, 498 P.2d 1089 (1972); *State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371.

**{¶42}** In the instant case, the state filed a motion on the morning of trial, requesting that the court call Onugha as an Evid.R. 614(A) witness. The state argued that Onugha claims that her memories of the incident have vanished. Ford stipulated to the admission of this evidence. On appeal, Ford argues the state was disingenuous because it had full knowledge, almost two months earlier at codefendant J.W.'s juvenile court proceedings, that Onugha testified she had prayed and asked God to erase her memory of the incident and that she no longer remembered the event.

**{¶43}** Evid.R. 614(A) provides that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." "Evid.R. 614(A) exists to bring about the proper determination of a case. A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, is a principal candidate for application of Evid.R. 614(A)." *State v. Curry*, 8th Dist. Cuyahoga No. 89075, 2007-Ohio-5721, ¶ 18.

**{¶44}** Immediately after the incident, Onugha gave consistent accounts of what transpired. At the time of trial, however, she claimed that her memories of the incident vanished. The trial court allowed the state to cross-examine Onugha with her original statements so that the jury could hear her memories of the incident.

**{¶45}** In *State v. Green*, 66 Ohio St.3d 141, 148, 609 N.E.2d 1253 (1993), the Ohio Supreme Court held that a defense attorney's decision to stipulate to prior statements fell "within the wide range of reasonable professional assistance." Here, we also find that defense counsel's

decision to stipulate to the state's Evid.R. 614(A) motion fell within the wide range of reasonable professional assistance.

**{¶46}** Ford also contends that defense counsel's decision not to request a limiting instruction regarding Onugha's credibility was deficient. In *State v. Durham*, 8th Dist. Cuyahoga No. 94747, 2012-Ohio-2053, ¶ 12, we held that defense counsel's decision whether to request a limiting instruction involves strategic choices of counsel that fell within the realm of trial strategy and tactics that will not ordinarily be disturbed on appeal. Similarly, defense counsel's decision in the instant case to not request a limiting instruction was a strategic choice.

**{¶47}** Ford additionally argues that defense counsel was ineffective for failing to object to the foundational basis for the jail-cell calls made by Ford to outside individuals. He claims this error was compounded when defense counsel stipulated to the authenticity of these calls.

**{¶48}** In *State v. Thompson*, 8th Dist. Cuyahoga No. 96929, 2012-Ohio-921, we addressed the admissibility of jailhouse phone calls. We stated:

> Evid.R. 901 governs the authentication of demonstrative evidence, including recordings of telephone conversations. The threshold for admission is quite low, and the proponent of the evidence need only submit "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). "[T]he proponent must present foundational evidence that is sufficient to constitute a rational basis for a jury to decide that the primary evidence is what its proponent claims it to be." *State v. Tyler*, 4th Dist. [Ross] No. 10CA3183, 196 Ohio App.3d 443, 964 N.E.2d 12, 2011-Ohio-3937, ¶ 25, citing *State v. Payton*, 4th Dist. [Ross] No. 01-CA2606, 2002-Ohio-508. A proponent may demonstrate genuineness or authenticity through direct or circumstantial evidence. *Tyler* at *id.*, citing *State v. Williams*, 64 Ohio App.2d 271, 274, 413 N.E.2d 1212 (8th Dist.1979).

> For a recorded telephone call to be admissible, the recording must be "authentic, accurate, and trustworthy." *Tyler* at ¶ 26, citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263. But, because "conclusive evidence as to authenticity and identification need not be presented to justify allowing evidence to reach the jury," the evidence required to establish authenticity need only be sufficient to afford a rational basis for a jury to decide that the evidence is what its

proponent claims it to be. *State v. Bell*, 12th Dist. [Clermont] No. CA2008-05-044, 2009-Ohio-2335, 2009 WL 1395857, ¶ 17, 30.

*Thompson* at ¶ 27-28.

{¶49} We note that in order to establish that the audio recording is a recording of a jail-cell conversation, the state is not required to "'prove beyond any doubt that the evidence is what it purports to be.'" *Id.* at ¶ 29, quoting *State v. Moshos*, 12th Dist. [Clermont] No. CA2009-06-008, 2010-Ohio-735, ¶ 12, citing *State v. Aliff*, 4th Dist. [Ross] No. 99CA8, 2000 Ohio App. LEXIS 1676 (Apr. 12, 2000). Rather, the state need only to demonstrate a "reasonable likelihood" that the recording was authentic. *Bell* at ¶ 30, citing Evid.R. 901(B)(1). "Such evidence may be supplied by, but is not limited to, the testimony of a witness with knowledge, voice identification, or by evidence that a call was made to the number assigned at the time by the telephone company to a particular person." *Thompson* at ¶ 29, citing Evid.R. 901(B)(1), (5), and (6); *Moshos* at ¶ 14; *State v. Small*, 10th Dist. [Franklin] No. 06AP-1110, 2007-Ohio-6771, ¶ 38.

{¶50} Evid.R. 901 provides for two methods by which a trial court may find that these phone conversations are admissible. Evid.R. 901(B)(9) provides that a sound recording may be authenticated through evidence that demonstrates a process or system used that produces an "accurate result." Evid.R. 901(B)(5) provides for authentication by voice identification "whether heard firsthand or through mechanical or electronic transmission or recording."

{¶51} In *Thompson*, the defendant's girlfriend and a sergeant of the Cuyahoga County Sheriff's Department testified about the phone calls. The girlfriend identified the defendant's voice on the phone calls. *Thompson,* 8th Dist. Cuyahoga No. 96929, 2012-Ohio-921, at ¶ 13. The sergeant testified that "each jail inmate is given an identification number and that number,

along with the last four digits of an inmate's social security number, must be inputted when an inmate makes a phone call." *Id.* at ¶ 7. We found that the voice identification, phone records, and testimony of the sergeant were sufficient to constitute a reasonable showing of authenticity. *Id.* at ¶ 32.

{¶52} After reviewing the record in the instant case, we are concerned with the manner in which the state laid the foundation for the recordings of Ford's jail-cell calls. Nevertheless, we cannot conclude that but for the introduction of the jail-cell calls, the result of the proceedings would have been different.

{¶53} The state relied on Euclid Police Detective Schultz to identify Ford's voice on the phone calls, despite testifying that he briefly spoke to Ford one time, approximately eight months ago, when he attempted to interview him. Detective Schultz testified as follows:

[STATE]: Do you recognize [Ford's] voice in those recorded conversations?

[DETECTIVE SCHULTZ]: I do.

[STATE]: If you heard those again, do you think you would recognize them?

[DETECTIVE SCHULTZ]: I would.

[STATE]: Detective, I would like to play State's Exhibit 5. We're going to advance to 5 minutes and 33 seconds into this recording.

(Audiotape played in open court)

[STATE]: We're stopping at 6 minutes and 15 seconds in. Detective Schultz, did you recognize the male voice that we heard in that recording?

[DETECTIVE SCHULTZ]: I did.

[STATE]: Whose voice was that?

[DETECTIVE SCHULTZ]: That was [Ford's].

**{¶54}** While the manner in which the state laid its foundation is concerning, defense counsel chose as strategy to stipulate to the authenticity of the phone calls and then attack Detective Schultz's memory with regard to his identification of Ford's voice. Debatable trial tactics and strategies do not necessarily amount to a denial of the right to effective assistance of counsel. *Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189. Moreover, the jury was presented with other sufficient testimony regarding Ford's involvement in the crime and his identification as one of the assailants. Therefore, we cannot say the outcome would have been different had defense counsel not stipulated to the authenticity of the jail-cell calls and objected to the foundational basis for the phone calls.

**{¶55}** Accordingly, the third assignment of error is overruled.

**{¶56}** Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, A.J., and
TIM McCORMACK, J., CONCUR