[Cite as *State v. Gordon*, 2018-Ohio-2292.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 106023**

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**NEEKO GORDON**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-609261-A

**BEFORE:**    Blackmon, J., E.A. Gallagher, A.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:**    June 14, 2018

-i-

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Maxwell Martin
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

{¶1}   Neeko Gordon ("Gordon") appeals from his convictions for multiple offenses associated with the murder of Ricardo Nieves ("Nieves").  As Gordon states in his appellate brief, "There is no dispute that Ricardo Nieves died on August 25, 201[6] from a gunshot wound to the head.  The issue in this case is who did it."  Gordon assigns the following errors for our review:

   I.  Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

   II. The convictions were against the manifest weight of the evidence.

   III. The trial court erred by admitting a jail call that was not properly authenticated and violated Evid.R. 401, 402 and 403 and deprived appellant of his constitutional rights to due process and a fair trial.

   IV. The trial court erred by admitting a Facebook photograph that was not properly authenticated and violated Evid.R. 401, 402 and 403 and deprived appellant of his constitutional rights to due process and a fair trial.

   V.  The trial court erred by giving a flight instruction over appellant's objection and that was not supported by the record.

   VI.  The trial court erred and violated appellant's due process right to a fair trial by allowing Joe Butler to testify, over the defense's objection, that appellant carries a revolver and had been seen with it days before the shooting.

{¶2}   Having reviewed the record and pertinent law, we affirm the decision of the trial court.  The apposite facts follow.

I.      **Introduction**

{¶3}   On August 25, 2016, Robert Holsey ("Holsey") agreed to purchase marijuana from Gordon.  Holsey and Gordon knew each other from playing basketball at Trent Park. Nieves drove Holsey to the marijuana-purchase- meeting place on W. 38th Street in Cleveland.

As Nieves and Holsey drove toward the meeting place, they saw Gordon, became suspicious, and started to drive away. Through the side mirror of the car, Holsey saw Gordon raise his arm with an object in his hand, then Holsey heard shots fired. Gordon ran away. Holsey realized Nieves had been shot. Holsey, who was in the passenger seat of the vehicle, ducked to avoid further gunfire and pressed the gas pedal with his hand. Holsey stopped the car at the next intersection, put Nieves in the back seat, and drove toward MetroHealth. Holsey got into an accident near the hospital, and called 911.

{¶4} When the police arrived, Holsey told them that Nieves was shot by a man named "Neeko" who stays at a house on W. 41st Street. The police went to this house and found Gordon there. Holsey identified Gordon as the person who shot Nieves. Nieves later died from a gunshot wound to the neck and head.

{¶5} On September 2, 2016, a grand jury indicted Gordon for aggravated murder, murder, attempted murder, three counts of felonious assault, discharging a firearm in a prohibited area, tampering with evidence, and having a weapon while under disability. On June 20, 2017, a jury acquitted Gordon of the aggravated murder and attempted murder charges and convicted him of all other counts. On June 29, 2017, the court sentenced Gordon to an aggregate prison term of 28 years to life. It is from these convictions that Gordon appeals.

## II. Trial Testimony

### Eyewitness Robert Holsey

{¶6} Holsey testified that he and Nieves ran into Gordon at a convenient store on Fulton Road on August 25, 2016. Holsey knew Gordon because they had played basketball together in the neighborhood. Video surveillance footage from the convenient store was introduced into evidence. It showed Holsey, Nieves, and Gordon in the store and in the parking

lot on the day in question. Gordon was wearing an orange shirt in the video, and he had a dark-colored shirt or towel slung over his shoulder.

{¶7} Holsey arranged to buy marijuana from Gordon. Gordon said the marijuana was "stashed," and they were to meet nearby on W. 38th Street. Nieves drove his white Toyota Corolla, with Holsey in the passenger seat, to the meeting place. As they were driving north on W. 38th Street toward Robert Avenue, they saw Gordon waving at them.

{¶8} According to Holsey, "something odd came about." Holsey continued:

As we was coming closer, he kept going back toward the fence. * * * That's cool. But what didn't make sense is what the neighbors — he's an African American man and * * * there's Caucasian white people right there and they're just staring at him. And he's waving us towards the gate. That didn't make no sense. That was hot. As I mean hot that was too — that was too noisy policewise. The neighbors look like why is he there? That didn't make sense to us. So as we drove off, Neeko Gordon was come here, right here. I got it right here. It didn't make no sense at all.

As soon as we went * * * he fired two, three shots as he was running towards the car.

* * *

What I could see was him waving us towards the — trying to get us to exit the vehicle towards the car. We said no. There was people out there that was staring at him out the window like why is he right there and there was another guy on his porch looking him [sic] weird. We wasn't going to get out of the [sic] and do a drug deal and somebody call the police right there.

* * *

It was pure daylight. He was the only African American man by that fence and by that area and the rest were just two white guys and somebody staring out the window.

{¶9} Asked what Gordon was wearing that day, Holsey replied, "Neeko Gordon was wearing an orange shirt. He had on like something on top of his shirt like he was holding like a towel because it was hot or a T-shirt because it was real hot." Holsey further testified that

Gordon was wearing "black or bluish" sweatpants. Holsey testified that, from his "vantage point," he did not see Gordon with a gun. Asked how he knew that Gordon fired the shot, Holsey testified as follows:

> Because as I heard the first gunshot I looked back instantly and I could see through that side window right him going like this, his arm extended like this, orange T-shirt something still above his thing but there definitely was an object in his hand there should be no reason his arm was up pointed towards as soon as I looked through that side window right there and after the last shot I could see him run down.
>
> * * *
>
> He ran towards the main street. He seemed like he was just running. I'm sorry. It was a quick glance. It was fast because I wanted to duck from the bullet. But as soon as I looked through that side window was Neeko that guy right there with his arm up pointed forward just like that.
>
> And I grabbed [Nieves] and I grabbed his head down so he wouldn't get hit but he was already dead. It was him. It was him. It was him.

{¶10} Holsey testified that after he heard the first gunshot and noticed that Nieves was dead, he grabbed Nieves and "went down. I hit the gas pedal with my hand while grabbing [Nieves] and I'm steering and I just flew down the street. * * * I know I had to hit two or three cars but that's what I had to do. It was gunshots going." Holsey made it to the next street and "threw" Nieves in the back seat of the car. Holsey drove toward MetroHealth, but he rear-ended another car at the corner of W. 25th and Meyer Avenue. Holsey called 911. Holsey testified that Nieves was bleeding "uncontrollably" and ultimately Nieves was taken by ambulance to the hospital.

{¶11} Holsey told the police that he knew where the person who shot Nieves was. "I know what house he at." Holsey testified that when he played basketball with Gordon, Gordon was "always in front of that house on 41st." Holsey told the police the shooter's name was

"Neeko" and described his appearance, including "a tattoo that says 'Heaven' right here on his chest." The police drove Holsey to the house he identified at 3252 W. 41st Street. Gordon was there and the police brought him outside. Gordon had changed his pants and had no shirt on, but Holsey identified him as the person who shot Nieves.

{¶12} On cross-examination, Holsey testified that he saw Gordon in the driver's side-view mirror "running towards the car with his arm extended," although Holsey did not see Gordon with a gun. Defense counsel asked Holsey the following:

> Q: Well, what did Neeko have in his hand every minute of this video that you just watched? What did he have in his hand the whole time he talked to you by that car? What did he have in his hand?
>
> A: A phone.

### Officer Noel Hernandez

{¶13} Cleveland police patrol officer Noel "Bo" Hernandez testified that on August 25, 2016, he responded to an emergency call of "a male shot * * * in the area of W. 38th and Clark." Officer Hernandez was rerouted to W. 25th Street and Meyer Avenue, where the shooting victim and the driver were involved in a motor vehicle accident. When officer Hernandez arrived at the scene, he saw a white car and Holsey "outside screaming for help. Screaming for my help and screaming for police help and yelling at us that his brother has been shot." According to Officer Hernandez, Holsey was "hysterical."

{¶14} Holsey indicated that he knew who the shooter was, and he believed he knew where the shooter went — to a house on "41st and Storer." Officer Hernandez called his Lieutenant and got permission to bring Holsey to the house in question. Police officers knocked, and three black males opened the front door. All three males were shirtless. All three denied being in the area of the shooting. The police told the men they were "investigating a shooting

that happened not too long ago." One officer also stated, "and this might be related to a possible homicide." Gordon responded, "So he died?"

{¶15} The officers took Gordon outside for a cold stand. Officer Hernandez "heard [Holsey] scream that's him. That's the shooter. That's the guy who killed [Nieves]." The police arrested Gordon at this time.

### Detective Walter Emerick

{¶16} Cleveland police detective Walter Emerick testified that he works for the crime scene investigation unit, and he performed a gunshot residue test on Gordon's hands while Gordon was outside on W. 41st Street, just over two hours after the shooting took place. Detective Emerick also recovered an "[o]range T-shirt out of the hamper within one of the bedrooms," a black cell phone, and ".22 live rimfired rounds," which are unfired bullets. On cross-examination, Det. Emerick testified that he did not "bag" Gordon's hands nor were Gordon's hands bagged at anytime that he was aware of.

### Detective David Borden

{¶17} Cleveland police homicide Det. David Borden testified that he responded "to the intersection of W. 38th and Robert [Avenue] and we started to canvass the area for witnesses and other evidence that might be useful in this homicide investigation." Det. Borden spoke with Anthony Sobczyk, who lives one or two houses from where the shots were fired. Sobczyk gave the following description of the suspect: "black male, five-ten, five-eleven, medium build, wearing a red shirt and blue jeans and short hair." According to Det. Borden, Sobczyk informed him that the suspect used a revolver in the shooting and fired two shots. Det. Borden testified

that the police did not find any shell casings on the scene. According to Det. Borden, "[r]evolvers do not eject casings."

{¶18} Det. Borden testified that he interviewed Farmer Baker, who lives on the corner of W. 38th and Robert Avenue and saw "an individual running west on Roberts" wearing a red shirt.

### Forensic Scientist Lisa Przepyszny

{¶19} Lisa Przepyszny testified that she is a forensic scientist in the trace evidence department of the Cuyahoga County Medical Examiner's Office. Przepyszny analyzed the gunshot residue test taken from Gordon's hands on August 25, 2016. She found "particles that were characteristic of * * * gunshot primer residue and that would indicate that either the individual fired a gun, was in close proximity to a fired gun, or handled an object that had gunshot residue on it."

### Deputy Medical Examiner Dr. Todd Barr

{¶20} Dr. Todd Barr testified that he is a forensic pathologist who is serving as a deputy medical examiner in the Cuyahoga County Medical Examiner's Office. Dr. Barr performed Nieves's autopsy on August 26, 2016, and concluded that Nieves died from "a gunshot wound to the head and neck." In Dr. Barr's opinion, Nieves' wound "is most consistent with a distant gunshot wound [of] [g]reater than four feet." According to Dr. Barr, "the path of the projectile, it entered in the * * * left side in the back of the neck, back of the head, and basically went through the skin soft tissue muscles. * * * And then it travels through and fractures one of his neck bones, one of his vertebrae. * * * And then it comes out through the back of his mouth * * *." Dr. Barr determined that the manner of death was homicide.

### Eyewitness Anthony Sobczyk

{¶21} Anthony Sobczyk testified that he lives at 3278 W. 38th Street in Cleveland, and on August 25, 2016, at about 4:30 p.m., he witnessed a shooting on his street. He was getting pizzas out of the passenger side of his car, which was parked on the street, when he saw a "[b]lack male, about 18, short, short hair, medium build" walking "suspiciously" down the street. Sobczyk testified that the person was wearing "I believe jeans and I think a bright shirt." According to Sobczyk, this person was suspicious because "in a matter of seconds he disappeared. * * * He crouched behind the fence."

{¶22} Sobczyk's testimony continued: "Then I seen a white car coming down the street slowly. It wasn't racing or nothing. Stopped at the stop sign. Next thing I know the guy jumped up, went in the street, fired the shot, car took off, he took off, that was it." Sobczyk testified that he did not see anybody else on the street, and he only heard one shot. According to Sobczyk, the man was about 15 feet from the car when he fired the shot.

### Officer Jonathan Holub

{¶23} Cleveland police officer Jonathan Holub testified that he is Officer Hernandez's partner, and he was driving their zone car on August 25, 2016, when they responded to the shooting in question. The officers first went to W. 38th and Clark, near where the shooting occurred, then went to W. 25th and Meyer, where Holsey and Nieves got into the car accident. Next, Officer Holub drove Officer Hernandez and Holsey, who was in the backseat, to "the area of W. 41st [and] the house where the suspect was."

{¶24} After Gordon's arrest, Gordon is captured on Officer Holub's body camera talking to a relative through the police car window. This family member came outside from the house where the police found Gordon. After reviewing the video from his body camera, Officer Holub

testified that Gordon said, "it's not enough. [T]hey don't got shit on me." Officer Holub further testified that Gordon "said he was alone" at the time of the incident.

### Eyewitness Letha Sanchez

{¶25} Letha Sanchez testified that she was sitting on the front porch of a home located at W. 38th Street and Robert Avenue on August 25, 2016, when she heard gunshots. Sanchez hurried off the porch and saw "somebody go by with a red shirt and black pants on. And it looks like he was putting a gun in his pocket as he was running. * * * I just hurried up and * * * got in my car and left." Sanchez testified that she "was in a panic" and her observation "was real brief." Sanchez recalled that the person was "a black male," but other than his clothing, she could not identify him. Sanchez did not recall seeing anybody else.

### Detective Thomas Lynch

{¶26} Cleveland police Det. Thomas Lynch testified that he interviewed Gordon, who had been taken into custody at 3252 W. 41st Street. Gordon was in the back seat of a zone car and agreed to speak with Det. Lynch about "what was going on that day." Det. Lynch testified that Gordon said he was at his girlfriend's house, then he took the bus to W. 25th Street and Clark, "then made his way to the convenience store on Fulton, Fulton Beverage * * *." Gordon ran into Holsey, who "he knew from the neighborhood, I believe he said it was from playing basketball * * *." Gordon told Det. Lynch that he was wearing a white T-shirt when he saw Holsey. Gordon said he took the white T-shirt off at his aunt's house on W. 41st Street, "before the police arrived." Det. Lynch asked Gordon if he had a cell phone, and Gordon told him that he did not, because he smashed it after a fight with his girlfriend and threw it in a dumpster.

{¶27} Det. Lynch testified that the police obtained permission from the owner of the house on W. 41st Street to "take a look around" for a gun. The police recovered Gordon's cell

phone and "some bullets" from the owner of the house's bedroom. Additionally, they "recovered an orange shirt with a stain on the front of it" from a clothes hamper.

{¶28} Det. Lynch interviewed Gordon again at the police station the next day. Gordon now told police that he had two cell phones, the one he smashed and the one found in the house on W. 41st Street. Additionally, when the police told Gordon that surveillance video from the day of the shooting showed him wearing an orange shirt — and not a white one, which is what he previously told the police — Gordon admitted that he had been wearing an orange shirt the day before. Gordon then gave the police "three basic stories as to what had occurred."

> [T]he first time we asked him about what had happened he said that he was walking on West 38th Street when the car that he had talked to at the convenient store drove by him and he told us as the car drove by him, someone from behind him had shot at the car. * * *
>
> The second story that he told was that as he got to the corner after leaving the store and walking across the street as he was at the corner, the car passed by him and he saw the male that he had talked to at the store like had his hand in the air like he was saying what's up and he — so he responded like what's up like this, raising his hand up in the air.
>
> But he could not explain how Ricardo Nieves got shot.
>
> And then the third way he explained what had happened — basically about three-quarters of the way into the interview he's like I'm going to tell you the truth.
>
> And he * * * stated that as he was walking down West 38th Street the vehicle that he had encountered and spoke with Robert Holsey in at the convenience store came down the street and as this vehicle approached him, Robert Holsey was holding his hand in the air like he had a gun and that Neeko held his hand up in the air * * * like to scare him like he had a gun pointed in his direction and then Neeko heard a gunshot. And I asked him where did the gunshot come from and he couldn't explain where the gunshot came from.

{¶29} According to Det. Lynch, in all three versions of his story, Gordon claimed that he was by himself and that he ran away from the scene.

{¶30} On cross-examination, Det. Lynch stated that he did not interview the two other black males who were in the house on W. 41st Street at the time Gordon was arrested. He also stated that "one or two" of the eyewitnesses to the shooting that were interviewed stated that the shooter was wearing a red, rather than an orange, shirt. However, Det. Lynch testified that "[r]ed and orange is not a big discrepancy in my opinion."

> [I]f someone was saying the shooter had a white shirt on, then we'd have a problem. Or if the shooter had a yellow shirt on, we have a problem. Red and orange can be easily mistaken.

> People see colors differently. I can see something as one color and someone else sees it as a different shade of blue or something along those lines.

> Red and orange in my opinion and Det. Sandoval's opinion was not a huge discrepancy.

{¶31} Det. Lynch testified that video surveillance footage taken from a nearby neighborhood camera shows Gordon "running down the alley" wearing an orange shirt at 4:41 p.m. on August 25, 2016, which is immediately after the shots were fired.

{¶32} Det. Lynch testified that the orange shirt that was recovered from the clothes hamper was not the same orange shirt that Gordon was wearing in the video footage captured just prior to and after the shooting.

{¶33} Det. Lynch also established that nobody saw Gordon with a gun on day of the shooting, and nobody saw more than one person running from the scene. The neighborhood eyewitnesses, who do not know Gordon, heard gunshots and saw a black male in a "bright" or red T-shirt run away from the scene, heading west on Robert. Holsey, who knows Gordon, heard gunshots and saw Gordon, through the side-view mirror of the car, approaching the car with his arm pointed out and then running from the scene.

## Toni Roberson

{¶34} Toni Roberson testified that on August 25, 2016, she was living at 3252 W. 41st Street, and Gordon, who she has known "since he was about three," was staying with her. Gordon was friends with her son Joe Butler. On that day, Gordon called Roberson looking for Butler. Roberson was at the store at the time. According to Roberson, there was nothing out of the ordinary about the call or the way Gordon sounded. When she went home, Gordon, Butler, another friend, and the police were there. Roberson gave the police permission to search her home. The police recovered bullets but did not recover a gun from her house. Roberson testified that the bullets the police found belonged to her, although she did not own a gun.

## Joseph Butler

{¶35} Joseph Butler testified that, on August 25, 2016, he was living at 3252 W. 41st Street with his mother. He and Gordon grew up together. That afternoon, Butler was at a store on W. 38th and Newark when Gordon called him and said, "I just did a drill." Butler testified that a "drill" meant that Gordon "just shot or killed somebody." According to Butler, Gordon was "real hyped like, you know, just hyped, like real hyped, anxious and stuff. [H]e was asking where I was at, come home now, come home now." Butler went home and

Gordon "was waiting for me at the screen door. And that's when he went inside. He took his shirt off, like a peach shirt, he took it off, and then that's when the cops * * *, everybody came and stuff." Butler testified that Gordon put his shirt "right on his dirty clothes, his clothes bag."

{¶36} Butler let the police in his house and he, Gordon, and another friend were asked questions. Although Gordon had told Butler that he just shot somebody, Butler made no mention of this to the police. Asked why, Butler testified as follows:

A: Cuz I didn't want to be involved around this. I didn't want to be doing this * * * what I'm doing now. I don't want to be around the police, court, none of that, so I don't want nothing to do with this. But since he's trying to say I did it, yeah.

Q: Did you do it?

A: No.

Q: Did you have anything to do with it?

A: No. I wasn't even there.

{¶37} Butler testified that he knew Holsey through other friends and they "hung out." Eventually they stopped hanging out, and Butler testified as to why:

A: When me and [Gordon] and [Holsey], we hit a lick and [Holsey] hit his house for bread and we ain't even seen him since that day. And probably like two and a half, three years.

Q: All right. So you said that [Gordon] and [Holsey] hit a lick?

A: Yeah.

Q: What does that mean?

A: Basically, well, we went — we took somebody up top basically.

Q: Took somebody up top? What does that mean?

A: Strong arm them.

Q:      You robbed somebody?

A:      Well, basically.

Q:      With the two of them[?]

A:      Yeah, basically.

Q:      And then you said that he —

A:      He ran off.  He just —

Q:      [Holsey?]

A:      He ran of[f] and we ain't never seen him since then.

Q:      And he took the money you were supposed to have?

A:      We supposed to split it basically but he went his separate way and that was that.  We ain't never seen him since then until — until he saw him.

{¶38} Butler testified that "back in these days in August," Gordon "was carrying a revolver," and Butler saw Gordon with it "two days before" the shooting.  Asked why Butler did not tell the police this, Butler replied, "That was because I didn't want to get involved with none of this stuff at all.  Period."  Butler testified that he did not carry a gun; however, on cross-examination, defense counsel introduced seven photographs Butler posted on his Facebook page that showed him with a gun or multiple guns, more than one of which was a revolver.

**Detective Joselito Sandoval**

{¶39} Cleveland police homicide Det. Joselito Sandoval testified that he and his partner Det. Lynch investigated the murder of Nieves in August 2016.  Det. Sandoval testified that, according to Holsey, who witnessed the shooting, the suspect was named or nicknamed "Neeko."

After interviewing witnesses and gathering information, Det. Sandoval found no reason to develop any other suspects in this case.

> We had learned that there was one suspect in this shooting * * *.
>
> We also saw the direction that was consistent with the witnesses on the direction in which he fled from that intersection of West 38th and Robert which is the direction of the house we were at West 41st.
>
> Also based on our interviews with Toni Roberson and her son and friend, they were consistent in their statements that they weren't present at the house when the shooting occurred and were at a different location up towards Clark Avenue and returned * * * just prior to the police arriving.

{¶40} Det. Sandoval testified about surveillance video from a camera located at 3919 Robert Avenue, just west of W. 38th Street. The video shows that on August 25, 2016, at 4:38 p.m., Nieves's white Corolla traveled through the intersection of W. 38th Street and Robert Avenue. Gordon, who is wearing the same orange T-shirt with a dark colored shirt or towel over his shoulder that he was wearing in the Fulton Beverage video from earlier that day, is seen "running from where that car came from. There he goes. He runs to W. 39th Street up toward Hyde Court."

{¶41} Det. Sandoval next testified about surveillance video taken from a camera located at 3929 Hyde Court. The video shows that on August 25, 2016, at 4:39 p.m., Gordon ran down Hyde Court, which is an alley, heading toward W. 41st Street and wearing the same orange T-shirt with the dark shirt or towel over his shoulder.

{¶42} Det. Sandoval next testified about his familiarity with the county's system of monitoring telephone calls made by inmates from the county jail. "Inmates when they arrive at county jail are given specific [PIN] numbers to them to make phone calls." Det. Sandoval testified about a particular call that was played for the jury. Gordon allegedly identified himself

at the beginning of the call. "[T]hey have the greeting and part of the greeting is they advise you this call is from — and they fill it in with their name, which was Neeko, and then it continued to advise you about it being monitored and recorded." The prosecutor then asked Det. Sandoval the following:

> Q:     Were you able to hear the defendant in that clip talking about ditching the gun?
>
> A:     Yes.

{¶43} Det. Sandoval testified that, essentially, Gordon's phone conversation from jail is about a hypothetical. Asked if Gordon said that he "hid a gun," Det. Sandoval answered, "No."

{¶44} Det. Sandoval next testified about a picture that he found posted on a Facebook page belonging to "Yonko Boolin." According to Det. Sandoval, Yonko was Gordon's nickname. Det. Sandoval testified that there "appears to be a shotgun in his right hand and he's standing next to a male in a yellow shirt that appears to have a firearm stuck in his waistband like towards the front." On cross-examination, Det. Sandoval testified that he does not know when this picture was taken, he does not know if the gun is real, and he does not know who the man in the photo is.

{¶45} Det. Sandoval testified that the shirt that was confiscated from the house on W. 41st is not the same shirt that Gordon was wearing in the video surveillance footage. Det. Sandoval testified that Holsey's testimony about what he saw through the side mirror of the car is consistent with what the other witnesses saw.

> The actions of the suspect are identical to what the witnesses had given us.
>
> And you're right, I understand red shirt, and * * * his pants were very dark blue. But, the action of the suspect and this vehicle at the intersection were described as Mr. Holsey describes it.

So they kind of corroborated what he did tell us. And the direction of flight, it's the same thing.

\* \* \*

We have witnesses that were at that intersection that saw the shooter run up to the victim's vehicle moving north bound at Robert Avenue, shoot into the car, the only person out there on foot, and then flee on Robert.

We obtained video. If you'll look at the video, there's only one subject that comes running in that direction from that white car and it's Neeko Gordon.

And he runs downs the alley towards the house where he's later found.

\* \* \*

But see the clothing he's wearing; you see he's one in the same from the store. \* \* \*

From the store he's wearing the blue shirt over his shoulder just like he is in the alley where he's seen with the blue shirt over his shoulder carrying his tennis shoes in the other and his hand down in his pocket.

## III.    Sufficiency of the Evidence

{¶46} Crim.R. 29 mandates that the trial court issue a judgment of acquittal when the prosecution's evidence is insufficient to sustain a conviction for the offense. Crim.R. 29(A) and sufficiency of the evidence require the same analysis. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 101, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶47}** The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Vickers*, 8th Dist. Cuyahoga No. 97365, 2013-Ohio-1337, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

**{¶48}** In the case at hand, Gordon argues that there was insufficient evidence to convict him of all counts, because the state failed to prove that he was the person who shot and killed Nieves. "Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. This truism is reflected in the state's constitutional burden to prove the guilt of 'the accused' beyond a reasonable doubt." *State v. Tate*, 140 Ohio St.3d 442, 19 N.E.3d 888, 2014-Ohio-3667, ¶ 15.

**{¶49}** Specifically, Gordon argues that he was merely in the area of W. 38th St. and Robert Avenue, in Cleveland, when the shot was fired. Nobody saw him with a gun and no gun was recovered. Three eyewitnesses described a man wearing a red shirt and black pants who was running away from the scene. Holsey identified Gordon as the shooter, and it is undisputed that Gordon was wearing an orange shirt at the time of the shooting. According to Gordon, this evidence is insufficient to support his convictions.

**{¶50}** Gordon was convicted of the following offenses: murder in violation of R.C. 2903.02(B); felonious assault in violation of R.C. 2903.11(A)(1); two counts of felonious assault in violation of R.C. 2903.11(A)(2); discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3); tampering with evidence in violation of R.C. 2921.12(A)(1); and having a weapon while under disability in violation of R.C. 2923.13(A)(2).

**{¶51}** Gordon's arguments focus on the sufficiency of the evidence that he — rather than a black male with a red shirt — shot Nieves. As this assigned error only concerns the

shooter's identity, we need not analyze every element of each offense. Upon review of the record, particularly Holsey's identification of Gordon as the shooter coupled with the surveillance video of Gordon running from the scene, we find that the state presented sufficient evidence that, if believed, would convince the jury of Gordon's guilt. Accordingly, Gordon's first assigned error is overruled.

## IV. <u>Manifest Weight of the Evidence</u>

{¶52} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror'

and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

**{¶53}** An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶54}** Gordon argues that his case is on point with *State v. Williams*, 8th Dist. Cuyahoga No. 95796, 2011-Ohio-5483, in which this court reversed a murder conviction because the defendant's only link to the shooting was the testimony of two other participants in the drug-deal-gone-bad who were implicated in the crime scene. *Id.* at ¶ 29-30. In *Williams*, this court found that

> the appellant was not linked to the crime or crime scene by any tangible evidence. The only link between appellant and the shooting was the testimony of Jackson and Jefferson. Neither Jackson nor Jefferson came forward and provided statements to police until after DNA evidence had physically linked each of them to the crime scene. The credibility of both of these witnesses was called into question at trial. * * * Only after Jefferson's DNA was tied to the crime scene, and he was threatened with a charge of obstructing justice, did Jefferson implicate appellant in [the] shooting.

*Id.* at ¶ 29.

**{¶55}** Similar to Gordon's first assigned error, this argument concerns the shooter's identity. Of the witnesses who testified about the shooting, Holsey was the only one to identify Gordon as the shooter. Additionally, Butler testified that Gordon told him he "just did a drill" shortly after Nieves was shot.

{¶56} Upon review, we find that *Williams* is distinguishable from the case at hand. First, there is forensic evidence that implicates Gordon in Nieves's shooting in that Gordon's hands tested positive for gunshot residue. Second, Holsey immediately identified Gordon as the shooter, and Holsey was never implicated in this crime. Third, other neutral eyewitnesses heard gunshots and saw a man dressed similar to Gordon at the scene and running away after the shots were fired. Fourth, Gordon is caught on video running away from the scene immediately after the shooting. Fifth, Gordon is caught on video talking to Holsey and Nieves immediately prior to the shooting, which corroborates Holsey's testimony that he had arranged to buy marijuana from Gordon. Sixth, Nieves's autopsy report concludes that he died from one bullet that entered the back of his neck on the left side and exited through his head and face. The autopsy also confirmed that the gun was fired more than four feet from Nieves. This is consistent with Holsey's and Sobczyk's testimony that the shooter was firing as Nieves was driving away, which was the position Gordon was in when the shooting occurred.

{¶57} We cannot say that the jury lost its way in convicting Gordon of murder, felonious assault, discharging a firearm in a prohibited area, and having a weapon while under disability.

{¶58} Additionally, the evidence shows that no gun was ever found. Furthermore, when police questioned Gordon at the house on W. 41st Street not long after the shooting, Gordon was not wearing the orange shirt that he had on when he was running from the scene. That shirt was never recovered. Accordingly, we cannot say that the jury lost its way in convicting Gordon of tampering with evidence.

{¶59} Gordon's second assigned error is overruled.

## V.    Admissibility of Evidence

{¶60} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). "Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983).

### A.    Authentication of the Jail Call

{¶61} Before evidence is deemed admissible at trial, it must be authenticated. Ohio law "provides a liberal standard for the authentication of evidence." *State v. Inkton*, 8th Dist. Cuyahoga No. 102706, 2016-Ohio-693, ¶ 73. Pursuant to Evid.R. 901(A), authentication "is satisfied by evidence sufficient to support a finding that the matter in questions is what its proponent claims." Specifically, Evid.R. 901(B)(5) states that a voice may be authenticated or identified, "whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing that voice at any time under circumstances connecting it with the alleged speaker."

{¶62} In the case at hand, Det. Sandoval testified about a phone call Gordon allegedly made from jail. The entirety of this direct examination testimony follows:

Q:     Detective, are you familiar with a system in place in the county jail to monitor phone calls made by inmates from the county jail?

A:     Yes.

Q:     And can you give us a summary of how that system works as far as PIN numbers, identifiers like that and how calls are made?

A:     Inmates when they arrive at county jail are given specific numbers to them to make phone calls.   And I think they have to have money on — either to make calls straight out, they would have to have money reserved for those calls.

Q:     And each inmate is given a unique PIN number, correct?

A:     Yes.

Q:     And that's not just for their calls, it's for anything that they would like to purchase in the jail their assigned an SO number; isn't that right?

A:     That's correct an SO number, yes.

Q:     And when those calls are made, are you aware that at the beginning of each call there's a warning read by the system that the call will be recorded?

A:     Yes.

Q:     I would then like to play for you * * * State's Exhibit 335.   And I'd like for you to * * * listen to the beginning first and then we'll skim ahead to the pertinent parts.   Okay?

       * * *

Q:     Did you hear the defendant identify himself at the beginning of this call?

A:     At the beginning of the call they have the greeting and part of the greeting is they advise you this call is from — and they fill it in with their name, which was Neeko, and then it continued to advise you about it being monitored and recorded.

* * *

Q:     Were you able to hear the defendant in that clip talking about ditching the gun?

A: Yes.

{¶63} On appeal, Gordon argues that this call was improperly admitted into evidence for two reasons: first, Det. Sandoval did not properly authenticate the call; and second, the content of the call was prejudicial. Gordon argues that the detective did not testify that he was familiar with or that he recognized Gordon's voice; rather, "he answered a leading question in the affirmative." Gordon next argues that the call was about a hypothetical and it had no relation to the facts of this case.

{¶64} Upon review, we find that the call was improperly authenticated. "To be admissible, a tape recording must be authentic, accurate, and trustworthy." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 109. Det. Sandoval did not expressly identify Gordon as the caller. Rather, he testified that the caller identified himself as "Neeko" at the beginning of the call. Det. Sandoval also testified that he was "present" for the "sit down interview" of Gordon at the police station, approximately ten months before trial. According to the record, this is the only time Det. Sandoval heard Gordon speak. Furthermore, although Det. Sandoval testified about the basic process for making calls from the jail, he did not testify that the call played for the jury in the case at hand originated from Gordon's PIN number. Additionally, Det. Sandoval did not testify as to the accuracy of the jail call process.

{¶65} This court has previously held a jail call was properly authenticated when the following testimony was presented at trial: the victim testified that she received the calls in question from the defendant and identified his voice on the recording; and two employees from the Cuyahoga County Sheriff's Office testified about how jail calls are recorded and, particular to Christopher Thompson's case, how they downloaded calls made from Thompson's inmate

number and calls that Thompson made using another inmate's account. *State v. Thompson*, 8th Dist. No. 96929, 2012-Ohio-921, ¶ 7-13. *See also State v. St. Anthony Ford*, 8th Dist. Cuyahoga No. 105698, 2018-Ohio-2128, ¶ 52 ("[W]e are concerned with the manner in which the state laid the foundation for the recordings of Ford's jail-cell calls. Nevertheless, we cannot conclude that but for the introduction of the jail-cell calls, the result of the proceedings would have been different.").

**{¶66}** Turning to the contents of the call, we find that the error in admitting evidence that was not properly authenticated was harmless. We cannot say that, but for the introduction of this jail call, Gordon would not have been convicted of killing Nieves. Pursuant to Crim.R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." This court has held that a "nonconstitutional error is harmless when there is substantial other evidence to support the guilty verdict." *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 97.

**{¶67}** After reviewing the record, we find substantial evidence to support Gordon's convictions. Holsey, who knew Gordon, identified Gordon as the shooter. Two eyewitnesses saw a man dressed similarly to Gordon run away from the scene. Gordon was captured on video running away from the scene. Forensic evidence shows gunshot residue on Gordon's hands when he was arrested approximately two hours after the shooting. Butler testified that Gordon said he "just did a drill" after the shooting.

**{¶68}** Accordingly, we conclude that the jail call was not unfairly prejudicial, and Gordon's third assigned error is overruled.

**B.** **Authentication of the Facebook Photograph**

**{¶69}** The leading case in Ohio regarding the authentication of electronically stored information from social networking websites appears to be *State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-13-1223, 2015-Ohio-1679, which this court has cited with approval in *State v. Inkton*, 8th Dist. Cuyahoga No. 102706, 2016-Ohio-693, ¶ 85-86.

> Facebook users often "post content — which can include text, pictures, or videos — to that user's profile page" delivering it to the user's subscribers. These posts often include information relevant to a criminal prosecution: "party admissions, inculpatory or exculpatory photos, or online communication between users." Authentication concerns arise in regard to printouts from Facebook "because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password," and, consequently, "[t]he potential for fabricating or tampering with electronically stored information on a social networking" site is high.

(Citations omitted.) *Gibson* at ¶ 35.

**{¶70}** In the case at hand, over Gordon's objection, the trial court admitted a photograph that Det. Sandoval testified he "came into the possession of" from the Facebook page of Yonko Boolin. Det. Sandoval testified that the home screen of Gordon's cell phone has the name "Yonko" on it. The picture, which is undated and contains no text or writing, shows two black males, one with a gun in the waistband of his jeans and the other holding what appears to be a shotgun in front of his face. Det. Sandoval testified that "Neeko Gordon has — appears to be a shotgun in his right hand * * *." On cross-examination, Det. Sandoval further testified about the photo as follows:

Q: Do you see anything on here that would say what date this was taken on?

A: No.

* * *

Q: So we don't know when it was taken, right?

A: I cannot tell you. Correct.

Q:   And we don't know whether this gun is even real, do we?

A:   No.

Q:   And we don't know who this guy is, do we?
A:   I don't know him.

{¶71} There is no evidence that Gordon has a Facebook page using the name Yonko Boolin.  There is no evidence about who retrieved this photo or when it was retrieved.  There is no evidence that Gordon is one of the men in the photograph.  Upon review, we find that the state failed to present evidence to properly authenticate this photograph.  *Compare State v. Yates*, 8th Dist. Cuyahoga No. 96774, 2012-Ohio-919, ¶ 36 (finding that a MySpace.com photograph was properly authenticated when "the state presented a representative from MySpace.com that testified as to the creation of the MySpace account [and] testimony from a witness [identified] on the MySpace page as being a friend of Yates, that this was Yates's MySpace account").

{¶72} Furthermore, we find that this photograph was improperly admitted as "other acts" evidence.  The state did not suggest that one of the guns in the photograph was the murder weapon in the instant case.  The photograph tends to show that Gordon is the type of person who has a gun, and therefore, it is probable to conclude that he acted in conformity therewith concerning the shooting of Nieves on the night in question.  Under Evid.R. 404(B), evidence is inadmissible for this purpose.

{¶73} Despite finding that the trial court erroneously admitted the photograph, we must determine if the error was harmless.  As analyzed previously in this opinion, this court concluded that there was substantial independent evidence of Gordon's guilt.  Therefore, we

cannot say that the admission of photograph was prejudicial to Gordon. Although the court erred by admitting this photograph, we find that the error was harmless.

{¶74} Accordingly, Gordon's fourth assigned error is overruled.

## C. Other Acts Testimony that Gordon "Carries a Revolver"

{¶75} Pursuant to Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See also* R.C. 2945.59.

{¶76} In *State v. Crosby*, 186 Ohio App.3d 453, 928 N.E.2d 795, 2010-Ohio-1584, ¶ 14-18 (8th Dist.), this court found that the trial court improperly admitted testimony about the defendant being known to carry a gun in general.

> [T]he testimony about defendant being seen with a gun bears no * * * relationship to the offenses he was convicted of. Four witnesses testified that defendant was known to carry a gun. The first witness testified that he knew defendant to carry a 9 mm gun; however, he had not seen defendant for two years prior to the night of the offense, and he did not see defendant with a gun on the date in question.
>
> The victim and another witness testified that they knew defendant to carry a 9 mm gun; however, no mention was made of any time-frame or specific incidents when defendant was seen with a gun. The fourth witness testified that he has known defendant to carry a gun, but not a 9 mm. Other than the victim's testimony that defendant shot him, nobody testified that they saw defendant with a gun on or near the date of the offense.
> Furthermore, the weapon was not recovered in the instant case. Thus, the other acts evidence does not link defendant to the gun used to shoot the victim, and was therefore improperly admitted.

*Id.* at ¶ 14-16.

**{¶77}** The *Crosby* court concluded that the admission of this testimony was harmless error under Crim.R. 52(A), because there was other credible evidence to support the defendant's convictions. *Id*. at ¶ 17-18.

**{¶78}** In the case at hand, Butler testified as follows about Gordon carrying a gun:

Q: Does Neeko carry a revolver?

A: Yes.

Q: When did you see him with it prior to the shooting?

* * *

A: Like I told him[1] two days before.

**{¶79}** We find that the case at hand is similar to *Crosby*. The gun was never recovered and there is no evidence other than speculation that a revolver was used to kill Nieves. "Federal and Ohio courts have recognized the introduction of other weapons evidence — i.e., irrelevant evidence of weapons unrelated to the charges — as error." *State v. Thomas,* 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 36. The *Thomas* court noted that "[e]rror in admitting other weapons evidence falls generally into one of two categories: harmless error or prejudicial error requiring reversal." *Id.* at ¶ 38. "Cases in which courts have deemed error in the admission of other weapons evidence to be harmless generally involved overwhelming independent evidence of guilt." *Id*. at ¶ 39.

**{¶80}** As analyzed previously in this opinion, this court concluded that there was substantial independent evidence of Gordon's guilt; therefore, we find Butler's other weapons testimony to be harmless. Accordingly, Gordon's sixth assigned error is overruled.

---

[1] It is unclear from the record who "him" is. Butler previously testified that he knew Gordon to carry a gun sometime in August 2016.

## VI.    Flight Jury Instruction

**{¶81}** "A trial court should give a proposed jury instruction if it is a correct statement of the law and is applicable to the facts of the particular case." *State v. Rose*, 8th Dist. Cuyahoga No. 89457, 2008-Ohio-1262, ¶ 18.   "Flight from justice means some escape or affirmative attempt to avoid apprehension." *State v. Wesley*, 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429, ¶ 19.    To warrant a flight instruction, there must be evidence "that the defendant took affirmative steps to avoid detection and apprehension beyond simply not remaining at the scene of the crime." *State v. Johnson*, 8th Dist. Cuyahoga No. 99715, 2014-Ohio-2638, ¶ 109.   Whether to issue a particular jury instruction is reviewed for an abuse of discretion. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578.

**{¶82}** In the case at hand, it is undisputed that Gordon fled the scene, because he is caught on camera doing so.   On appeal, Gordon argues that "the evidence merely established that appellant left the scene and went home."   However, the surveillance video shows Gordon running down the street and through an alley seconds after Nieves's white Corolla is seen driving through the intersection and shots were fired.   This is more than "merely" going home. Furthermore, the court gave the jury a limiting instruction as follows:

> You are instructed that the fact that the defendant fled the scene does not raise a presumption of guilt but it may tend to indicate the defendant's consciousness of guilt. * * * [I]f you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider the evidence for any purpose; however, if you find that the facts support the defendant engaged in such conduct and if you decide that defendant was motivated by a consciousness of guilt, you may but are not required

to consider that * * * evidence in deciding whether the defendant is guilty of the crimes charged.

**{¶83}** Upon review, we that the evidence does not weigh in favor of Gordon merely running away from gunfire, because all of the witnesses testified that there was only one black male crouching by the fence and coming toward the white car with his arm pointed when the shots were fired. Furthermore, there was only one black male running from the scene after the shots were fired. Accordingly, we find that the court did not abuse its discretion by instructing the jury regarding flight. Gordon's fifth assigned error is overruled.

**{¶84}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, JUDGE

MARY EILEEN KILBANE, J., CONCURS;
EILEEN A. GALLAGHER, A.J., CONCURS
WITH ATTACHED OPINION

EILEEN A. GALLAGHER, A.J., CONCURRING WITH SEPARATE OPINION:

{¶85} I concur with the judgment of my learned colleagues but write separately to address the admissibility of testimony related to the phone calls that emanated from the Cuyahoga County jail in this matter and that have been attributed to the defendant.

{¶86} In this case, the state elicited testimony from a Cleveland Police Department homicide Det. Joselito Sandoval, as to the Cuyahoga County jail telephone call system. Det. Sandoval is not an employee of the Cuyahoga County Sheriff's Department that has control of the jail operations. He provided testimony as to the telephone monitoring system utilized in the Cuyahoga County jail along with testimony regarding a call made by a person who identified himself as "Neeko."

{¶87} It is my opinion that an employee of the Cuyahoga County Sheriff's Department should have provided testimony as to the telephone system utilized in the county jail. It certainly would not have been onerous to have a representative of the sheriff's department testify as to the process and then the content of that phone call.

{¶88} The state frequently uses law enforcement officers from municipalities to provide testimony as to Cuyahoga County jail operations, and I find it to be troubling. In this case, the error is harmless but in the future, it may not be.